# District of Columbia
# Court of Appeals



DEC 22 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

No. 14-CV-101

COMPETITIVE ENTERPRISE INSTITUTE AND RAND SIMBERG,

Appellants,

CAB-8263-12

v.

MICHAEL E. MANN,

Appellee.

No. 14-CV-126

NATIONAL REVIEW, INC.,

Appellant,

v.

MICHAEL E. MANN,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE:  BECKWITH and EASTERLY, *Associate Judges*; and RUIZ, *Senior Judge.*

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's denial of the special motions to dismiss the defamation claims is affirmed, and the matter is remanded for additional proceedings in the trial court with respect to these claims.  The trial court's denial of the special motions to dismiss with respect to Appellee's claims for defamation and intentional infliction of emotional distress are reversed; on remand, the court shall dismiss these claims with prejudice.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated:  December 22, 2016.

Opinion by Senior Judge Vanessa Ruiz.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

FILED **12/22/16**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-101

COMPETITIVE ENTERPRISE INSTITUTE AND RAND SIMBERG, APPELLANTS,

V.

MICHAEL E. MANN, APPELLEE,

NO. 14-CV-126

NATIONAL REVIEW, INC., APPELLANT,

V.

MICHAEL E. MANN, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CAB-8263-12)

(Hon. Natalia M. Combs Greene, Trial Judge)
(Hon. Frederick H. Weisberg, Trial Judge)

(Argued November 25, 2014               Decided December 22, 2016)

*Andrew M. Grossman*, with whom *David B. Rivkin, Jr.*, and *Mark I. Bailen* were on the brief, for appellants Competitive Enterprise Institute and Rand Simberg.

*Michael A. Carvin*, with whom *David M. Morrell* and *Anthony J. Dick* were on the brief, for appellant National Review, Inc.

*John B. Williams*, with whom *Peter J. Fontaine* and *Catherine Rosato Reilly* were on the brief, for appellee Michael E. Mann.

*Ariel B. Levinson-Waldman*, Senior Counsel to the Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia at the time the brief was filed, and *Todd S. Kim*, Solicitor General, were on the brief, for amicus curiae the District of Columbia, in support of the court's appellate jurisdiction to review interlocutory order.

*Michael J. Songer* and *Daniel J. Kornstein* were on the brief for amicus curiae Mark Steyn, in support of the court's appellate jurisdiction to review interlocutory order.

*Ilya Shapiro*, *Nicholas C. Dranias*, *Bradley A. Benbrook*, and *Stephen M. Duvernay* were on the briefs, in support of appellants, for amici curiae The Cato Institute, Reason Foundation, Individual Rights Foundation, and Goldwater Institute.

*Gregg P. Leslie*, *Cynthia A. Gierhart*, *Seth D. Berlin*, *Shaina Jones Ward*, and *Mara J. Gassmann* were on the brief, in support of appellants, for amici curiae The Reporters Committee for Freedom of the Press; The American Civil Liberties Union of the Nation's Capital; American Society of News Editors; Association of Alternative Newsmedia; The Association of American Publishers, Inc.; Bloomberg L.P.; The Center for Investigative Reporting; First Amendment Coalition; First Look Media, Inc.; Fox News Network, LLC; Gannett Co., Inc.; The Investigative Reporting Workshop; The National Press Club; National Press Photographers Association; NBCUniversal Media, LLC; Newspaper Association of America; North Jersey Media Group, Inc.; Online News Association; Radio Television Digital News Association; The Seattle Times Company; Society of Professional Journalists; Stephens Media LLC; Time Inc.; Tribune Publishing; The Tully Center for Free Speech; D.C. Communications, Inc., d/b/a Washington City Paper; and WP Company LLC d/b/a The Washington Post.

*David A. Cortman*, *Kevin H. Theriot*, *Christopher Byrnes*, and *Kurt Van Sciver* were on the brief, in support of appellants, for amicus curiae Alliance Defending Freedom.

*Phillip C. Chang*, *Jonathan E. Buchan*, *E. Duncan Getchell*, and *Amy Miller* were on the brief, in support of appellants, for amici curiae Newsmax Media, Inc.; Free Beacon, LLC; The Foundation for Cultural Review; The Daily Caller, LLC;

PJ Media, LLC; and The Electronic Frontier Foundation.

Before BECKWITH and EASTERLY, *Associate Judges*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*: These appeals present us with legal issues of first impression concerning the special motion to dismiss created by the District of Columbia's Anti-Strategic Lawsuits Against Public Participation (Anti-SLAPP) Act, D.C. Code §§ 16-5501 to -5505 (2012 Repl.): whether denial of a special motion to dismiss is immediately appealable and the standard applicable in considering the merits of an Anti-SLAPP special motion to dismiss.

Appellee Michael E. Mann is a well-known climate scientist whose research in studying the "paleoclimate," or ancient climate, has featured prominently in the politically charged debate about climate change. Dr. Mann filed an action for defamation and intentional infliction of emotional distress against Competitive Enterprise Institute (CEI), Rand Simberg, National Review, Inc. (National Review), and Mark Steyn based on articles written by Mr. Simberg, Mr. Steyn, and National Review's editor Rich Lowry that appeared on the websites of CEI and National Review. Dr. Mann's complaint claimed that the articles which criticized Dr. Mann's conclusions about global warming and accused him of deception and academic and scientific misconduct contained false statements that injured his

reputation and standing in the scientific and academic communities of which he is a part.

Defendants argued that Dr. Mann's lawsuit infringes on their First Amendment right of free speech and moved for dismissal under the Anti-SLAPP Act and, alternatively, under Superior Court Rule 12 (b)(6). The trial court ruled that Dr. Mann's claims were "likely to succeed on the merits" — the standard established in the Anti-SLAPP Act to defeat a motion to dismiss — and denied appellants' motions to dismiss and their subsequent motions to reconsider. Appellants — CEI, National Review and Mr. Simberg — sought interlocutory review in this court of the trial court's denial of their motions to dismiss.[1]

As a preliminary matter, we hold that we have jurisdiction under the collateral order doctrine to hear appellants' interlocutory appeals of the trial court's denial of their special motions to dismiss filed under the Anti-SLAPP Act. We further hold that the Anti-SLAPP Act's "likely to succeed" standard for overcoming a properly filed special motion to dismiss requires that the plaintiff present evidence — not simply allegations — and that the evidence must be legally

---

[1] Defendant Steyn did not appeal the trial court's denial of his motions to dismiss the complaint.

sufficient to permit a jury properly instructed on the applicable constitutional standards to reasonably find in the plaintiff's favor. Having conducted an independent review of the evidence to ensure that it surmounts the constitutionally required threshold, we conclude that Dr. Mann has presented evidence sufficient to defeat the special motions to dismiss as to some of his claims.[2] Accordingly, we affirm in part, reverse in part, and remand the case to the trial court for further proceedings.

## I. Statement of the Case

## A. Factual Background

The facts presented in the complaint and subsequent pleadings filed with the court are as follows. Dr. Mann is a graduate of the University of California at Berkeley (B.S. Physics and Applied Math) and Yale University (M.S. Physics; Ph.D. Geology and Geophysics), and has held faculty positions at the University of Massachusetts's Department of Geosciences and the University of Virginia's

---

[2] Because we hold that the showing required to defeat an Anti-SLAPP special motion to dismiss is more demanding than is required to overcome a Rule 12 (b)(6) motion to dismiss, Dr. Mann's successful response to appellants' Anti-SLAPP special motions to dismiss necessarily also defeats appellants' Rule 12 (b)(6) motions to dismiss.

Department of Environmental Sciences. He is a Distinguished Professor of Meteorology and the Director of the Earth System Science Center at Pennsylvania State University (Penn State).[3] Dr. Mann is considered an authority on climate change science, and has been recognized with honors and awards for his work identifying global warming and its cause.

In 1998 and 1999, Dr. Mann and two colleagues[4] co-authored two scientific papers, the first of which was published in the international scientific journal *Nature* and the second of which was published in *Geophysical Research Letters*, that reported the results from a statistical study of the Earth's temperatures over

---

[3] According to the CV currently on Penn State's website, Dr. Mann's title is Distinguished Professor of Atmospheric Science. Michael E. Mann, *Curriculum Vitae* at 2, PENNSYLVANIA STATE UNIVERSITY DEPARTMENT OF METEOROLOGY, http://www.meteo.psu.edu/holocene/public_html/Mann/about/cv.php (last visited Aug. 31, 2016).

[4] The co-authors were Raymond S. Bradley and Malcolm K. Hughes. Dr. Raymond S. Bradley is the Principal Investigator, Distinguished Professor of Geosciences, and Director of Climate Systems Research Center at the Northeast Climate Science Center at the University of Massachusetts. He received a B.S. degree from the University of Southampton, United Kingdom, and M.S. and Ph.D. degrees from the University of Colorado at Boulder. Raymond Bradley, NE. CLIMATE SCI. CTR., https://necsc.umass.edu/people/raymond-bradley (last visited Aug. 31, 2016). Dr. Malcolm Hughes is Regents' Professor of Dendrochronology with the Laboratory of Tree-Ring Research at the University of Arizona. He received B.S. and Ph.D. degrees from Durham University, United Kingdom. Malcolm Hughes, UNIV. OF ARIZ. SCI. LAB. OF TREE-RING RESEARCH, http://ltrr.arizona.edu/people/hughes (last visited Aug. 31, 2016).

several centuries. Their 1998 study used a technique to reconstruct temperatures from time periods before the widespread use of thermometers in the 1960s by using "proxy indicators" (described by Dr. Mann as "growth rings of ancient trees and corals, sediment cores from ocean and lake bottoms, ice cores from glaciers, and cave sediment cores"). The data showed that global mean annual temperatures have been rising since the early twentieth century, with a marked increase in the last fifty years. The papers concluded that this rise in temperature was "likely unprecedented in at least the past millennium" and correlated with higher concentrations of carbon dioxide in the atmosphere emitted by the combustion of fossil fuels.

The 1999 paper included a graph depicting global temperatures in the Northern Hemisphere for a millennium, from approximately 1050 through 2000. The graphical pattern is roughly horizontal for 90% of the temperature axis — reflecting a slight, long-term cooling period between 1050 and 1900 — followed by a sharp increase in temperature in the twentieth century. Because of its shape resembling the long shaft and shorter diagonal blade of a hockey stick, this graph became known as the "hockey stick."[5] The hockey stick graph became the

---

[5] The hockey stick graph appears as follows:

(footnote continued . . . )

foundation for the conclusion that the sharp increase in temperature starting in the twentieth century was anthropogenic, or caused by concentrations of $CO_2$ in the atmosphere generated by human activity initiated by the industrial age. The hockey stick graph also became a rallying point, and a target, in the subsequent debate over the existence and cause of global warming and what, if anything, should be done about it.

In 2001, the Intergovernmental Panel on Climate Change (IPCC),[6] in its

_____

(. . . footnote continued)



Intergovernmental Panel on Climate Change, Climate Change 2001—IPCC Third Assessment Report (2001), http://www.ipcc.ch/ipccreports/tar/slides/05.16.htm.

[6] The IPCC is an international scientific body created under the auspices of the United Nations Environment Program and the World Meteorological

(footnote continued . . . )

Third Assessment Report, summarized the study and data that led to the hockey stick graph and featured several of the studies that replicated its data. In 2003 and 2005, mining consultant Stephen McIntyre and Professor Ross McKitrick[7] published articles claiming to demonstrate that the hockey stick graph was the result of bad data and flawed statistical analysis. That same year, in a study commissioned by two U.S. Congressmen, Professor Edward Wegman[8] concluded that Dr. Mann's statistical methodology was flawed. That same year, the National Research Council of the National Academies of Science, in a study commissioned by the U.S. House of Representatives, raised questions about the reliability of temperature reconstructions prior to 1600, but agreed substantively with the conclusions represented by the hockey stick graph. Follow-up, peer-reviewed studies published in the literature have independently validated conclusions illustrated by the hockey stick graph.

---

(. . . footnote continued)

Organization. *IPCC Factsheet: What is the IPCC?* 1 (2013), http://www.ipcc.ch/news_and_events/docs/factsheets/FS_what_ipcc.pdf (last visited Aug. 3, 2016). The IPCC was awarded the 2007 Nobel Peace Prize for its work on climate change, jointly with Al Gore. Dr. Mann was a lead author of the IPCC's 2001 Third Assessment Report.

[7] Professor of Economics, University of Guelph, Ontario.

[8] Professor of Statistics, George Mason University, Virginia.

In November 2009, thousands of emails from the Climate Research Unit (CRU) of the University of East Anglia in the United Kingdom — some between Dr. Mann and CRU climate scientists — were somehow obtained and anonymously published on the Internet, shortly before the U.N. Global Climate Change Conference was to begin in Copenhagen in December 2009. In a controversy dubbed "Climategate," some of these emails were cited as proof that climate scientists, including Dr. Mann, falsified or manipulated their data, in collusion with government officials, to produce the hockey stick result. The emails led to public questioning of the validity of the research leading to the hockey stick graph and to calls for evaluation of the soundness of its statistical analysis and the conduct of the scientists involved in the research, including, specifically, Dr. Mann.

Following disclosure of the emails and the questions raised, Penn State, the University of East Anglia, and five governmental agencies — the U.K. House of Commons Science and Technology Committee, the U.K. Secretary of State for Energy and Climate Change, the Inspector General of the U.S. Department of Commerce, the U.S. Environmental Protection Agency, and the U.S. National Science Foundation — issued reports after conducting inquiries into the validity of the methodology and research underlying the hockey stick graph and investigating

the allegations impugning the integrity of Dr. Mann's and other climate scientists' conduct. The inquiries that considered the science largely validated the methodology underlying the hockey stick graph. None of the investigations found any evidence of fraud, falsification, manipulation, or misconduct on the part of Dr. Mann.[9] These reports were published in 2010 and 2011.

On July 13, 2012, Mr. Simberg authored an article entitled "The Other Scandal in Unhappy Valley," which was published on OpenMarket.org, an online blog of CEI. Comparing "Climategate" with the then-front-page news of the Penn State sexual abuse scandal involving Jerry Sandusky that had been revealed in the

---

[9] The investigations considered the Climategate emails. For example, one of the most cited emails, from the director of the CRU to Dr. Mann and two other climate scientists, stated, "I've just completed [Dr. Mann's] *Nature* trick of adding in the real temps to each series for the last 20 years (i.e., from 1981 onwards) and from 1961 for Keith's to hide the decline." The University of East Anglia investigation concluded that the reference to the "trick" used in Dr. Mann's paper for the science journal *Nature* was a colloquialism used by the scientists to describe a specific and legitimate statistical technique used to interpret the data and to exclude certain non-relevant data. Philip Jones, the head of the UEA Climate Research Unit and author of the email, explained that "trick" did not refer to a deception, but rather to "the 'best way of doing or dealing with something,'" namely, the exclusion of proxy temperature data for a period in which thermometer readings were available (i.e., "the decline"). The UEA investigation concluded that the emails used "slang, jargon, and acronyms," and were "extreme modes of expression" but "no[t] indicative of actual behavior that is extreme, exceptional or unprofessional."

Freeh Report,[10] Mr. Simberg wrote:

> So it turns out that Penn State has covered up wrongdoing by one of its employees to avoid bad publicity.
>
> But I'm not talking about the appalling behavior uncovered this week by the Freeh report. No, I'm referring to another cover up and whitewash that occurred there two years ago, before we learned how rotten and corrupt the culture at the university was. But now that we know how bad it was, perhaps it's time that we revisit the Michael Mann affair, particularly given how much we've also learned about his and others' hockey-stick deceptions since. Mann could be said to be the Jerry Sandusky of climate science, except for instead of molesting children, he has molested and tortured data in service of politicized science that could have dire consequences for the nation and planet. . . .[11]
>
> [M]any . . . luminaries of the "climate science" community were shown to have been behaving in a most unscientific manner. Among them were Michael Mann, Professor of Meteorology at Penn State, whom the emails revealed had been engaging in data manipulation to keep the blade on his famous hockey-stick graph, which had become an icon for those determined to reduce human carbon emissions by any means necessary. . . .

---

[10]   Former FBI Director Louis Freeh conducted a review which severely criticized Penn State's investigation of sexual abuse complaints made against Penn State football coach Jerry Sandusky.

[11]   CEI subsequently deleted from its website the comment comparing Dr. Mann to Jerry Sandusky, characterizing it as "inappropriate." Rand Simberg, *The Other Scandal in Unhappy Valley*, COMPETITIVE ENTER. INST. (July 13, 2012), https://cei.org/blog/other-scandal-unhappy-valley.

Mann has become the posterboy of the corrupt and disgraced climate science echo chamber. No university whitewash investigation will change that simple reality. . . .

Michael Mann, like Joe Paterno, was a rock star in the context of Penn State University, bringing in millions in research funding. The same university president who resigned in the wake of the Sandusky scandal was also the president when Mann was being ~~whitewashed~~ investigated. We saw what the university administration was willing to do to cover up heinous crimes, and even let them continue, rather than expose them. Should we suppose, in light of what we now know, they would do any less to hide academic and scientific misconduct, with so much at stake?

It's time for a fresh, truly independent investigation.

(strike-through in original).

On July 15, 2012, Mr. Steyn authored an article titled "Football and Hockey," which appeared on *National Review*'s online blog "The Corner." In his article, Mr. Steyn quoted from Mr. Simberg's July 13 article:

I'm referring to another cover up and whitewash that occurred [at Penn State] two years ago, before we learned how rotten and corrupt the culture at the university was. But now that we know how bad it was, perhaps it's time that we revisit the Michael Mann affair, particularly given how much we've also learned about his and others' hockey-stick deceptions since. Mann could be said to be

the Jerry Sandusky of climate science, except that instead of molesting children, he has molested and tortured data in service of politicized science that could have dire consequences for the nation and planet.

Mr. Steyn then added:

Not sure I'd have extended that metaphor all the way into the locker-room showers with quite the zeal Mr. Simberg does, but he has a point. Michael Mann was the man behind the fraudulent climate-change "hockey-stick" graph, the very ringmaster of the tree-ring circus. And, when the East Anglia emails came out, Penn State felt obliged to "investigate" Professor Mann. Graham Spanier, the Penn State president forced to resign over Sandusky, was the same [one] who investigated Mann. And, as with Sandusky and Paterno, the college declined to find one of its star names guilty of any wrongdoing.

If an institution is prepared to cover up systematic statutory rape of minors, what won't it cover up? Whether or not he's "the Jerry Sandusky of climate change", [sic] he remains the Michael Mann of climate change, in part because his "investigation" by a deeply corrupt administration was a joke.

Dr. Mann's counsel wrote to appellants requesting an apology and retraction of the statements, and threatening litigation if the articles were not removed from their respective websites. The letter stated that the allegations of data manipulation and misconduct were false, and pointed to the investigations that had concluded Dr. Mann had not engaged in wrongdoing or manipulated data in a deceptive

manner. No apology was forthcoming, nor were the posted statements withdrawn. Instead, on August 22, 2012, Mr. Lowry wrote an editorial on *National Review*'s website titled "Get Lost" that referred to "Michael Mann of Climategate infamy," characterized his threatened litigation as "a nuisance lawsuit," and included a link to National Review's lawyer's response rejecting Dr. Mann's counsel's request for a retraction. Mr. Lowry explained that "[i]n common polemical usage, 'fraudulent' doesn't mean honest-to-goodness criminal fraud. It means intellectually bogus and wrong." The editorial concluded: "[Dr. Mann is] going to go to great trouble and expense to embark on a losing cause that will expose more of his methods and maneuverings to the world. In short, he risks making an ass of himself. But that hasn't stopped him before." The underlying lawsuit followed.

## B. Trial Court Proceedings

Dr. Mann filed his initial complaint on October 22, 2012, alleging libel and intentional infliction of emotional distress based on appellants' statements accusing him of improperly manipulating data to reach a preordained conclusion, deception, fraud, and misconduct. Appellants filed special motions to dismiss the complaint pursuant to the D.C. Anti-SLAPP Act and motions to dismiss for failure to state a claim under Superior Court Rule 12 (b)(6). Dr. Mann opposed the motions. On

July 19, 2013, Judge Natalia Combs Greene denied the motions. She determined that the subject of appellants' challenged statements brought them within the ambit of the Anti-SLAPP Act, but that Dr. Mann had made the required showing under the Act to defeat the special motions to dismiss. First, the trial court interpreted the "likely to succeed" standard in the Act as substantively similar to the standard for prevailing on a motion for summary judgment or motion for judgment as a matter of law. Second, the trial court concluded that Dr. Mann met this burden by making a prima facie showing that appellants' statements were defamatory and not sheltered by the fair comment privilege, and by providing sufficient evidence for the court to find that "discovery may uncover" that appellants acted with actual malice. Third, the trial court determined that Dr. Mann also made the requisite showing of malicious and outrageous conduct to support his claim of intentional infliction of emotional distress. Finally, the trial court determined that the complaint stated a claim, and thus survived a Rule 12 (b) (6) evaluation.

Appellants asked the trial court to vacate the denials of their motions to dismiss and, after the trial court denied this request, appellants moved for certification of the trial court's orders for interlocutory appeal. The trial court denied the motions for certification. Appellants then appealed to this court, which issued an order to show cause as to why the appeals should not be dismissed for

lack of jurisdiction as having been taken from non-appealable orders. On December 19, 2013, these appeals were dismissed as moot because Dr. Mann filed an amended complaint on June 28, 2013.

The amended complaint is substantially the same as the original complaint, with the addition of one count of libel based on the comment comparing Dr. Mann to Jerry Sandusky, which, in the original complaint, supported only the intentional infliction of emotional distress claim. Appellants renewed their motions to dismiss, and Dr. Mann opposed them. On January 22, 2014, Judge Frederick Weisberg denied the motions, reasoning that Judge Combs Greene's order denying the original motions to dismiss was the law of the case, and adding an analysis of the new defamation count. Appellants again filed motions seeking vacatur of the denial of their motions to dismiss and certification for interlocutory appeal, which were, again, denied by the trial court.

Appellants filed notices of appeal to this court, and Dr. Mann moved to dismiss the appeals on the ground that they seek review of non-final orders that are not immediately appealable, or, in the alternative, to expedite the appeal. The court ordered appellants to show cause as to why the court has jurisdiction to hear these interlocutory appeals. Appellants filed a response, as did Dr. Mann. The

court ultimately reserved the jurisdiction question, expedited the appeal, and ordered the parties to file briefs addressing the court's jurisdiction as well as the merits. The District of Columbia and non-appealing defendant Mr. Steyn filed a brief as amicus curiae in favor of the court's jurisdiction to hear the interlocutory order on appeal.[12] Several organizations filed briefs as amici curiae in support of appellants. We now address all issues.

## II. SLAPP Actions and the D.C. Anti-SLAPP Act

A "SLAPP" (strategic lawsuit against public participation) is an action "filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." Council of the District of Columbia, Report of Committee on Public Safety and the Judiciary on Bill 18-893, at 1 (Nov. 18, 2010) (hereinafter Report on Bill 18-893). Thus, the goal of a SLAPP "is not to win the lawsuit but to punish the opponent and intimidate them into silence." *Id.* at 4 (citing George W. Pring, *SLAPPs: Strategic Lawsuits Against Public Participation*, 7 PACE ENVTL. L. REV. 3, 3, 9-11 (1989)). Enacted in 2012, the D.C. Anti-SLAPP Act was designed to protect targets of such meritless lawsuits by

---

[12] Mr. Steyn also urged the court to act expeditiously as Dr. Mann's claims against Mr. Steyn, and Mr. Steyn's counterclaim, have been put on hold in the trial court pending resolution of this appeal.

creating "substantive rights with regard to a defendant's ability to fend off" a SLAPP. Report on Bill 18-893, at 1. The rights created by the Act comprise a special motion to dismiss a complaint, D.C. Code § 16-5502, and a special motion to quash discovery orders, requests for information, or subpoenas for personal identifying information in suspected SLAPPs, D.C. Code § 16-5503. This court has interpreted and applied the Anti-SLAPP Act with respect to the provisions concerning the special motion to quash a subpoena, *see Doe v. Burke* (*Burke I*), 91 A.3d 1031 (D.C. 2014), and the award of attorney's fees in connection with such a motion, *see Doe v. Burke* (*Burke II*), 133 A.3d 569 (D.C. 2016). This is the first case presented on appeal that raises the proper interpretation and application of the Act's special motion to dismiss.

Under the District's Anti-SLAPP Act, the party filing a special motion to dismiss must first show entitlement to the protections of the Act by "mak[ing] a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502 (b). Once that prima facie showing is made, the burden shifts to the nonmoving party, usually the plaintiff,[13] who must "demonstrate[] that the claim is likely to succeed on the

---

[13] The nonmoving party could also be the defendant in the original action, who has filed a counterclaim, and is responding to a special motion to dismiss filed

(footnote continued . . . )

merits." *Id.* If the plaintiff cannot meet that burden, the motion to dismiss must be granted, and the litigation is brought to a speedy end. *Id.* In this case, the parties agree that appellants made the requisite prima facie showing that the Act applies because the lawsuit is based on articles that appeared on CEI's and National Review's websites that concern the debate over the existence and causes of global warming. *See* D.C. Code § 16-5501 (1) (defining "[a]ct in furtherance of the right of advocacy on issues of public interest" to include "[a]ny written or oral statement made . . . [i]n a place open to the public or a public forum in connection with an issue of public interest . . . ."); D.C. Code § 16-5501 (3) ("'Issue of public interest' means an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place."). What is contested in this appeal is whether Dr. Mann met his burden of demonstrating that he is "likely to succeed on the merits" of his claims for defamation and intentional infliction of emotional distress. If he has, appellants' special motions to dismiss were properly denied, and the litigation continues. If he has not, the motions should have been granted, and the litigation would be terminated. But we must decide first whether this court has jurisdiction to decide that question at this stage of the litigation.

---

(. . . footnote continued)
by the counterclaim defendant. For the sake of clarity, we refer to the nonmoving party and plaintiff interchangeably.

### III. Jurisdiction

Denial of a special motion to dismiss filed under the Anti-SLAPP Act does not end the litigation and is not a final order. To the contrary, it signals that the litigation will continue.[14] Nor is it one of the types of interlocutory orders specified by statute over which this court has jurisdiction. *See* D.C. Code § 11-721 (a)(2)-(3) (2012 Repl.). The denial of a motion to dismiss filed under Rule 12 (b)(6) is not usually immediately appealable. *See McNair Builders, Inc. v. Taylor*, 3 A.3d 1132, 1135 (D.C. 2010). Thus, we must decide, in the first instance, whether the denial of a special motion to dismiss filed pursuant to D.C. Code § 16-5502 belongs to that "small class" of non-final orders that may be appealed under the collateral order doctrine established by the Supreme Court in *Cohen v. Beneficial Industrial Loan Corp.*, because it is "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." 337 U.S. 541, 546 (1949).

The test for application of the collateral order doctrine is "stringent." *McNair Builders*, 3 A.3d at 1136 (quoting *Will v. Hallock*, 546 U.S. 345, 349-50

---

[14] The grant of a special motion to dismiss, on the other hand, is appealable as a final order. *See* D.C. Code § 11-721 (a)(1).

(2006)). For an order to qualify for interlocutory review under the doctrine, "(1) it must conclusively determine a disputed question of law, (2) it must resolve an important issue that is separate from the merits of the case, and (3) it must be effectively unreviewable on appeal from a final judgment." *Id.* at 1135-36 (quoting, and overruling on other grounds, *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 339-40 (D.C. 2001)). "Effective" unreviewability encompasses the notion that the matter at stake concerns an issue of "substantial public interest." *Id.* at 1137. We conclude that these criteria are met where a special motion to dismiss filed under the Anti-SLAPP Act is denied as they are in the case of denial of a special motion to quash filed under the Act. *See Burke I*, 91 A.3d at 1038 ("[The] determination that an order is appealable under [these criteria] is 'not directed at the individual case, but to the entire category to which a claim belongs.'") (quoting *McNair Builders*, 3 A.3d at 1140 n.9)).[15]

---

[15] *Burke I* held that denial of a special motion to quash a subpoena to discover the identity of unidentified defendant(s) filed under the Anti-SLAPP Act is appealable on an interlocutory basis, 91 A.3d at 1036-40; it reserved the "related but separate question" of the appealability of an order denying a special motion to dismiss filed under the Act. *Id.* at 1036 n.6.

## A.  Conclusivity

First, a trial court's order denying a special motion to dismiss under the Anti-SLAPP Act "conclusively determine[s] a disputed question of law," *McNair Builders*, 3 A.3d at 1135:  whether the movant is entitled to dismissal under the Act.  In analyzing whether the denial of a special motion to quash under the Act is immediately appealable, the *Burke I* court concluded that the "conclusivity element" of the collateral order doctrine is "satisfied when a trial court has determined the movant is ineligible for protection under the [Anti-SLAPP] statute."  91 A.3d at 1038 (quoting *Godin v. Schencks*, 629 F.3d 79, 84 (1st Cir. 2010)).[16]  Here, appellants have received some measure of protection under the Act by having their motions to dismiss evaluated under the special provisions of the Act created to deter SLAPPs.  The application of the Act does not mean, however, that there is no "disputed question of law" for purposes of the collateral order doctrine.  There remains the specific disputed legal question of whether the movant is entitled to the Act's ultimate protection:  mandatory dismissal of the lawsuit at an early point in the litigation.  That is an issue a trial court conclusively

---

[16]  In *Burke I*, the special motion to quash was denied after the trial court determined that the movant failed to make a prima facie case that the lawsuit arose out of protected acts and that the plaintiff was likely to succeed on the merits.  91 A.3d at 1035.  This court reversed on both counts.  *Id.* at 1045.

determines when it rules on a special motion to dismiss. Therefore, denial of a special motion to dismiss satisfies the "conclusivity element" of the collateral order doctrine.

## B. Separability

Second, a trial court's order denying a special motion to dismiss "resolve[s] an important issue that is separate from the merits of the case." *McNair Builders*, 3 A.3d at 1135. The issue in the case of a special motion to dismiss, once the threshold prima facie case has been met by the movant, is whether the movant has a statutory right to be free of the burdens of defending the litigation. Resolution of both issues — whether the claim arises from acts protected by the Act and whether the movant is entitled to dismissal — will involve some of the same facts relevant to the merits of the claim. That commonality, however, does not necessarily preclude interlocutory review of the denial of an Anti-SLAPP special motion to dismiss.

An analogy to qualified immunity is apt. "[I]t follows from the recognition that qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Mitchell*

*v. Forsyth*, 472 U.S. 511, 527-28 (1985).  The special motion to dismiss created by the Anti-SLAPP Act "explicitly protects the right not to stand trial" in a SLAPP, which is intended as a "weapon to chill or silence speech."  *Burke I*, 91 A.3d at 1033, 1039; *see* Report on Bill 18-893, at 4 (referring to "other jurisdictions, which have similarly extended absolute or qualified immunity for individuals engaging in protected actions").  This statutory right is analogous to qualified immunity for official conduct in that its application depends on the court's resolution of whether the acts complained of entitle the defendant not to stand trial "under certain circumstances."  *Mitchell*, 472 U.S. at 525.  In this case we interpret the statutory standard ("likely to succeed on the merits") for determining special motions under the Act and, as discussed *infra*, conclude that the court must decide, as a matter of law, whether the plaintiff has produced (usually without the benefit of discovery) sufficient evidence to prevail on the claim.  In other words, the circumstance under which the Anti-SLAPP Act creates immunity from trial is a meritless SLAPP.  As we stated in *Burke I*, this "resolves a question separate from the merits in that it merely finds that such merits may exist, without evaluating whether the plaintiff's claim will succeed."  91 A.3d at 1039 (quoting *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003)).[17]

---

[17]    *Burke I* also explained that denial of a special motion to quash on the ground that the defendant was not entitled to protection under the Act is separable

(footnote continued . . . )

We readily acknowledge that this inquiry is not completely separable from the merits, but it need not be where it serves a different purpose. *See Henry v. Lake Charles Am. Press*, 566 F.3d 164, 175 (5th Cir. 2009) (noting that purpose of Anti-SLAPP special motions is "distinct from [the purpose] of the underlying suit"). As the Supreme Court has recognized, "although sometimes practically intertwined with the merits, a claim of immunity nonetheless raises a question that is significantly different from the questions underlying plaintiff's claim on the merits (*i.e.*, in the absence of qualified immunity)." *Johnson v. United States*, 515 U.S. 304, 314 (1995). As is the case with qualified immunity, the issue that the court must resolve in deciding a special motion to dismiss under the Anti-SLAPP Act is whether the defendant is entitled to immunity from trial, a question of law that involves the evaluation of the complained-of conduct against established legal standards. *Cf. Behrens v. Pelletier*, 516 U.S. 299, 313 (1996) (holding that court's denial of qualified immunity separate and immediately appealable because it "necessarily determined that certain conduct attributed to [defendant] (which was

---

(. . . footnote continued)

because whether "speech qualifies for protection under the statute is a separate question from whether [appellants] may be held liable for defamation." *Burke I*, 91 A.3d at 1038. As discussed *supra*, appellants' speech in this case was deemed to be covered by the Act.

controverted) constituted a violation of clearly established law").[18] Consequently, even though a court's determination involves consideration of evidence produced in support of the merits, in view of the purpose of the D.C. Anti-SLAPP Act to provide immunity from suit, a court's denial of a special motion to dismiss resolves an issue of law at the threshold of litigation — whether the defendant is entitled to immunity from trial — that is sufficiently separate from the ultimate question on the merits of the case decided at trial — whether the defendant is liable. *See Henry*, 566 F.3d at 175 (noting that Anti-SLAPP motion is "separate[] from the merits of the claim itself" because its purpose is to determine "'whether the defendant is being forced to defend a meritless claim,' not to determine whether the defendant actually committed the relevant tort" (quoting *Batzel*, 333 F.3d at 1025)).[19]

---

[18] *See id.* (contrasting *Johnson*, where what was "at issue in the sufficiency determination was nothing more than whether the evidence could support a finding that certain conduct occurred").

[19] *But see Ernst v. Carrigan*, 814 F.3d 116, 119-22 (2d Cir. 2016) (holding that even if Vermont Anti-SLAPP statute provides immunity from trial, consideration of special motion to dismiss takes into account fact-based determinations and is thus not "completely separate from the merits").

## C. Unreviewability

Third, a trial court's denial of a special motion to dismiss is "effectively unreviewable on appeal from a final judgment." *McNair Builders*, 3 A.3d at 1135 (quoting *Finkelstein*, *Thompson & Loughram*, 774 A.2d at 339-40). Denial of immunity from trial is the quintessential unreviewable order because the core of immunity from suit "is its possessor's entitlement not to have to answer for his conduct in a civil damages action." *Id.* at 1137 (quoting *Mitchell*, 472 U.S. at 525). The D.C. Anti-SLAPP Act provides not only immunity from having to stand trial but also protection from "expensive and time consuming discovery that is often used in a SLAPP as a means to prevent or punish" by "toll[ing] discovery while the special motion to dismiss is pending." Report on Bill 18-893, at 4. Consequently, the denial of a special motion to dismiss filed under the Act — a denial of the immunity from suit and pretrial burdens afforded by the statute — is the type of unreviewable order that falls squarely within the collateral order doctrine. *Accord Henry*, 566 F.3d at 178 (holding that denial of Anti-SLAPP motion to dismiss satisfies the third requirement of the collateral order doctrine because its purpose is to "provide[] a right not to stand trial"); *see also Behrens*, 516 U.S. at 308 (noting that the scope of protection afforded by qualified immunity, which includes the right to not stand trial and to avoid the burdens of pretrial matters, such as

discovery, made denial of immunity claim immediately appealable).

## D. Substantial Public Interest

Finally, and of particular importance in conducting a *Cohen* analysis, we conclude that because the denial of a special motion to dismiss implicates a "substantial public interest," it would be effectively unreviewable on appeal from a final judgment. *McNair Builders*, 3 A.3d at 1136. The purpose of the special motion to dismiss is to protect a "particular value of a high order" — the right to free speech guaranteed by the First Amendment — by shielding defendants from meritless litigation that might chill advocacy on issues of public interest. *Will*, 546 U.S. at 352 (citing cases involving separation of powers, states' dignitary interests under the Eleventh Amendment, and double jeopardy bar of the Fifth Amendment); *cf. McNair Builders*, 3 A.3d at 1141 (holding that contractor's asserted immunity under judicial proceedings privilege did not implicate a substantial public interest warranting interlocutory review). The legislative history of the Anti-SLAPP Act confirms that the legislature thought the denial of the Act's protection merited immediate appellate review. The original Anti-SLAPP bill presented to the Council of the District of Columbia included a provision for the interlocutory appeal of the denial of a special motion to dismiss or quash. This

provision was excluded from the final version of the bill following this court's decision in *Stuart v. Walker*, 6 A.3d 1215 (D.C. 2010), *vacated*, 30 A.3d 783 (D.C. 2011) (Mem.)., which held that a similar provision affecting the jurisdiction of the court is beyond the scope of the Council's authority. Report on Bill 18-893, at 7. The Council's evident intent and preference to include an interlocutory review provision — regardless of whether it had the authority to do so — is a significant indicator of its belief that "some particular value of a high order," *Will*, 546 U.S. at 352, is at issue that should be addressed by the court on appeal without waiting for completion of the litigation. *See Henry*, 566 F.3d at 181 (concluding that where statute "embodies a legislative determination that parties should be immune from certain abusive tort claims that have the purpose or effect of imperiling First Amendment rights, 'there is little room for the judiciary to gainsay its "importance"'" (quoting *Digital Equip. v. Desktop Direct*, 511 U.S. 863, 879 (1994))); *cf. Englert v. MacDonnell*, 551 F.3d 1099, 1105-06 (9th Cir. 2009) (holding that denial of special motion to strike under Oregon's anti-SLAPP statute was not immediately appealable where Oregon statute did not provide for immediate appellate review of such order).

We conclude that denial of Anti-SLAPP special motions to dismiss meet the requirements of conclusivity, separability, and effective unreviewability

established in *Cohen*, as further refined in *Will*, and is immediately appealable to this court. We come to this conclusion in light of the District of Columbia Anti-SLAPP Act's purpose to create a substantive right not to stand trial and to avoid the burdens and costs of pre-trial procedures, a right that would be lost if a special motion to dismiss is denied and the case proceeds to discovery and trial; our interpretation of the Act as requiring a judicial determination applying established principles of law in deciding a special motion to dismiss; and, most especially, the public interest in safeguarding important First Amendment rights in an expeditious manner as shown by the Council's evident desire to make denials of such motions, which must be filed and decided in the early stage of litigation, immediately appealable. *See Henry*, 566 F.3d at 176-78 (noting that a ruling on a special motion to dismiss under the Louisiana Anti-SLAPP statute meets every prong of the collateral order doctrine because the statute provides a right not to stand trial and bear the costs of defending a meritless defamation claim that can chill important First Amendment rights by gauging plaintiff's probability of success); *Batzel*, 333 F.3d at 1025-26 (holding that denial of special motion to dismiss under California Anti-SLAPP Act met *Cohen* standards because it created a substantive immunity from suit and provided for immediate right of appeal).

As we have determined that we have jurisdiction, we have two further

questions to address: (1) what is meant by the Act's language requiring the plaintiff to "demonstrate[] that the claim is likely to succeed on the merits," and (2) whether Dr. Mann has met this standard in the present case.

## IV. The Anti-SLAPP Act's "Likely to Succeed on the Merits" Standard for Special Motions to Dismiss

The Anti-SLAPP Act's special motion to dismiss creates a burden-shifting procedure that is triggered by the party seeking to invoke the special protections afforded by the Act. *See* D.C. Code § 16-5502.[20] The moving party (usually the

---

[20] D.C. Code § 16-5502 provides in its entirety:

> (a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.

> (b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

> (c)(1) Except as provided in paragraph (2) of this subsection, upon the filing of a special motion to dismiss,

(footnote continued . . . )

defendant)[21] files a special motion to dismiss within forty-five days after service of the complaint. *Id*. § 16-5502 (a). Filing of the motion stays discovery, unless the court grants a limited exception for discovery targeted to defeating the motion. *Id*. § 16-5502 (c). If the moving party makes a "prima facie showing" that the claim "arises from an act in furtherance of the right of advocacy on issues of public interest," the burden shifts to the party opposing the motion to "demonstrate[] that the claim is likely to succeed on the merits." *Id*. § 16-5502 (b) & (d). The court is required to hold an "expedited hearing" on the motion and to issue a ruling "as soon as practicable after the hearing." *Id*. § 16-5502 (d). If the plaintiff's opposition fails to meet the statutory standard, the Act requires the trial court to

---

(. . . footnote continued)

> discovery proceedings on the claim shall be stayed until the motion has been disposed of.

> (2) when it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted. Such an order may be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery.

> (d) The court shall hold an expedited hearing on the special motion to dismiss, and issue a ruling as soon as practicable after the hearing. If the special motion to dismiss is granted, dismissal shall be with prejudice.

[21] See *supra* note 13.

dismiss the complaint, with prejudice. *Id*. § 16-5502 (b) & (d). If the opposition is successful, the motion to dismiss is denied, *id*., and the litigation proceeds in the normal course.

For the reasons that follow, we conclude that in considering a special motion to dismiss, the court evaluates the likely success of the claim by asking whether a jury properly instructed on the applicable legal and constitutional standards could reasonably find that the claim is supported in light of the evidence that has been produced or proffered in connection with the motion. This standard achieves the Anti-SLAPP Act's goal of weeding out meritless litigation by ensuring early judicial review of the legal sufficiency of the evidence, consistent with First Amendment principles, while preserving the claimant's constitutional right to a jury trial.

We review questions of statutory interpretation de novo. *Burke I*, 91 A.3d at 1040.[22] Our analysis begins with the language of the statute, *see District of Columbia v. Place*, 892 A.2d 1108, 1111 (D.C. 2006), which requires that to

---

[22] *Burke I* held that the special motion to dismiss filed in that case should have been granted because the plaintiff's claim was unlikely to succeed. The court did not need to dwell on the precise interpretation of the "likely to succeed" standard in light of its conclusion that the record contained no evidence that the defendant acted with the requisite malice. 91 A.3d at 1045.

prevail in opposing a special motion to dismiss, the opponent must "demonstrate[] that the claim is likely to succeed on the merits." D.C. Code § 16-5502 (b). As neither the phrase nor any of its components is defined in the statute, we look to "the language of the statute by itself to see if the language is plain and admits of no more than one meaning." *Rodriguez v. District of Columbia*, 124 A.3d 134, 146 (D.C. 2015) (quoting *Dobyns v. United States*, 30 A.3d 155, 159 (D.C. 2011)). Although we can be confident that "on the merits" refers to success on the substance of the claim,[23] the meaning of the requirement that the opponent "demonstrate[] that the claim is likely to succeed" is more elusive. Use of the word "demonstrate"[24] indicates that once the burden has shifted to the claimant, the statute requires more than mere reliance on allegations in the complaint, and mandates the production or proffer of evidence that supports the claim. This interpretation is supported by another provision in the Act, § 16-5502 (c), that stays discovery upon the filing of a special motion to dismiss "until the motion has been disposed of," unless it "appears likely that targeted discovery will enable the

---

[23] "Merits" is defined as "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure." BLACK'S LAW DICTIONARY (10th ed. 2014).

[24] The relevant dictionary definitions of "demonstrate" are: "to show clearly and deliberately; manifest," and "to show to be true by reasoning or adducing evidence." THE AMERICAN HERITAGE DICTIONARY (5th ed. 2015).

plaintiff to defeat the motion and that the discovery will not be unduly burdensome." If evidence were not required to successfully oppose a special motion to dismiss under § 16-5502 (b), there would be no need for a provision allowing targeted discovery for that purpose.[25] Moreover, unless something more than argument based on the allegations in the complaint is required, the special motion to dismiss created by the Act would be redundant in light of the general availability, in all civil proceedings regardless of the nature of the claim, of motions to dismiss under Rule 12 (b)(6).

But what does it mean that the evidence must demonstrate that the claim is "likely to succeed"? In common parlance, the term "likely" connotes a predictive quality, and its dictionary definition is "probable."[26] The phrase conveys an assessment of the claimant's chance of success, but does not inherently provide the

---

[25] *See Tippett v. Daly*, 10 A.3d 1123, 1127 (D.C. 2010) (en banc) (referring to interpretation of statutory language as a "holistic endeavor" (quoting *Wash. Gas Light Co. v. Pub. Serv. Comm'n*, 982 A.2d 691, 716 (D.C. 2009))).

[26] "Likely" is defined as "[a]pparently true or real; probable. . . . Showing a strong tendency; reasonably expected (likely to snow)." BLACK'S LAW DICTIONARY, *supra* note 23. Rather unhelpfully, "probable," in turn, is defined in Black's as "[l]ikely to exist, be true, happen." *Id*. *See* THE AMERICAN HERITAGE DICTIONARY, *supra* note 24 (defining "likely" as "1. Possessing or displaying the qualities or characteristics that make something probable . . . 2. Within the realm of credibility; plausible . . . 3. Apparently appropriate or suitable . . . 4. Apt to achieve success or yield a desired outcome").

exact measure by which such an assessment is to be made. It could be argued that "likely to succeed" is different from and a lesser standard than "more likely than not to succeed," the phrase routinely used to mean a preponderance of the evidence, and that if the legislature had in mind a preponderance of the evidence standard, it would have used that well-known term of art. *See Haley v. United States*, 799 A.2d 1201, 1209 n.6 (D.C. 2002) ("The preponderance of the evidence standard requires proof that something more likely than not exists or occurred."). On the other hand, it seems counterintuitive to say that a claim is "likely to succeed" if it has a less than 50% chance of prevailing. In short, the statutory language's dictionary meaning, even if good enough for common parlance, leaves us in doubt as to its proper interpretation in the Anti-SLAPP Act.

Appellants argue that we should look to a similar phrase, "a likelihood of success on the merits," that is used to evaluate requests for temporary stays and preliminary injunctions. In that context, "a likelihood of success" has been defined to mean a "substantial likelihood" though not a "mathematical probability," *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 162 (D.C. 2013) (quoting *In re Estate of Reilly*, 933 A.3d 830, 837 (D.C. 2007)), and does not express a fixed

measurement,[27] as it is part of a multi-factor test where a stronger showing on some factors can compensate for a weaker showing on others.[28] The phrase "a likelihood of success" is similar (though not identical) on its face to the phrase "likely to succeed," and in both the preliminary injunction context and under the Anti-SLAPP Act, the judicial role involves prediction of ultimate success on the merits. The two terms should not automatically be equated, however, because of the different purpose and impact of the court's ruling in the two contexts. In granting a request for preliminary injunction, the court grants temporary relief to a movant who makes some showing of likelihood of success that is weighed, along with other factors such as irreparable harm, to preserve the status quo pending the final outcome of litigation. *See Nken*, 556 U.S. at 434 (noting that preliminary injunctions and stays similarly concern whether court order "may allow or disallow

---

[27] It has been suggested that, in the federal courts, "a likelihood of success" in the preliminary injunction context is to be contrasted with a chance of success that is only a "mere possibility" or "better than negligible," but without requiring a showing of success "more likely than not." *Citigroup Glob. Mkts. v. VCG Special Opportunities Master Fund*, 598 F.3d 30, 37 & n.7 (2d Cir. 2010) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009))).

[28] *See Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969) ("The likelihood of success on the merits that a movant for injunctive relief must demonstrate varies with the quality and quantum of harm that it will suffer from the denial of an injunction. 'Where it appears that a lack of a showing of irreparable [harm] exists . . . the party seeking a preliminary injunction has a burden of convincing with a reasonable certainty that it must succeed . . . .'" (quoting *Dino de Laurentiis Cinematografica v. D-150, Inc.*, 366 F.2d 373, 375 (2d Cir. 1966))).

anticipated action before the legality of that action has been conclusively determined"). Under the Anti-SLAPP Act, on the other hand, the result of the court's ruling in favor of the moving party means complete and final victory for that party by bringing the litigation to an end, avoiding a resolution by trial. Because it is a variable standard that is used for a different purpose, "a likelihood of success," the term used in deciding requests for preliminary injunctions and stays, does not determine the proper interpretation of the "likely to succeed" standard for deciding special motions to dismiss under the Anti-SLAPP Act.

Lacking a statutory definition, clear dictionary definition, or application as a term of art that reasonably can be borrowed from another legal context, the Anti-SLAPP Act's "likely to succeed on the merits" leaves us with "textual uncertainty." *Cass v. District of Columbia*, 829 A.2d 480, 486 (D.C. 2003). Our task, therefore, is to interpret the ambiguous term in a manner "that makes sense of the statute as a whole" by reference to legislative history and other aids to construction, such as applicable canons of statutory interpretation. *District of Columbia v. Reid*, 104 A.3d 859, 868 (D.C. 2014) (quoting *Cass*, 829 A.2d at 482).

We begin with what the legislature said it was trying to accomplish: to deter SLAPPs by "extend[ing] substantive rights to defendants in a SLAPP, providing

them with the ability to file a special motion to dismiss that must be heard expeditiously by the court." Report on Bill 18-893, at 4. The special motion to dismiss is a mechanism by which a SLAPP defendant can "expeditiously and economically dispense of litigation" to alleviate the burdens and cost of defending against a suit that is filed, not to succeed, but to "prevent or punish" the defendant's speech or advocacy. *Id.* To this end, a special motion to dismiss must be filed and decided in the early stage of litigation. D.C. Code § 16-5502 (a). If the trial court determines that the plaintiff has not met the statutory burden, the special motion to dismiss must be granted "with prejudice." *Id*. § 16-5502 (b) & (d). In short, the special motion to dismiss provision authorizes final disposition of a claim in a truncated proceeding, usually without the benefit of discovery, *id*. § 16-5502 (c), to avoid the toll that meritless litigation imposes on a defendant who has made a prima facie showing that the claim arises from advocacy on issues of public interest.

The dispositive nature of a court's grant of a special motion to dismiss after the claimant has been required to proffer evidence, but without a full opportunity to engage in discovery and before trial, is critical to our interpretation of the "likely to succeed" standard. An interpretation that puts the court in the position of making credibility determinations and weighing the evidence to determine whether

a case should proceed to trial raises serious constitutional concerns because it encroaches on the role of the jury.[29] In view of this concern, we apply the canon of constitutional avoidance, "an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). This canon leads us to interpret the phrase "likely to succeed on the merits," undefined in the D.C. Anti-SLAPP statute, in a manner that does not supplant the role of the fact-finder, lest the statute be rendered unconstitutional.[30] We, therefore, conclude that to remove

---

[29] *See Davis v. Cox*, 351 P.3d 862, 873-74 (Wash. 2015) (en banc) (declaring that Washington state's Anti-SLAPP special motion to dismiss, WASH. REV. CODE § 4.24.525 (2010), violates the state's constitutional guarantee to a jury trial because it required trial court to weigh the evidence and make factual determination whether there was "clear and convincing evidence [of] a probability of prevailing on the claim"); *Opinion of the Justices* (*SLAPP Suit Procedure*), 641 A.2d 1012, 1015 (N.H. 1994) (declaring that proposed Anti-SLAPP legislation would violate right to trial by jury guaranteed by state constitution because it would require court to "weigh the pleadings and affidavits on both sides and adjudicate a factual dispute" in determining whether claimant has shown "a probability of prevailing on the merits"); *Unity Health Care, Inc. v. Cty. of Hennepin*, 308 F.R.D. 537, 549 (D. Minn. 2015) (concluding that Minnesota Anti-SLAPP provision requiring that party opposing dismissal must persuade judge by clear and convincing evidence that defendant is not immune from liability violates Seventh Amendment right to jury trial because it requires judge to weigh evidence and make credibility determination), *interlocutory appeal docketed*, No. 15-2489 (8th Cir. July 10, 2015).

[30] *See Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 44 Cal. Rptr. 2d 46, 53 (1995) (interpreting standard for judging California's Anti-SLAPP motion to dismiss to avoid violating the state constitutional right to jury trial); *cf. Leiendecker v. Asian Women United of Minn.*, 848 N.W.2d 224, 232-33 (Minn.

(footnote continued . . . )

doubt that the Anti-SLAPP statute respects the right to a jury trial, the standard to be employed by the court in evaluating whether a claim is likely to succeed may result in dismissal only if the court can conclude that the claimant could not prevail *as a matter of law*, that is, after allowing for the weighing of evidence and permissible inferences by the jury. *Cf. Mixon v. Wash. Metro. Area Transit Auth.*, 959 A.2d 55, 58 (D.C. 2008) (explaining that summary judgment does not violate right to jury trial because it results in dismissal only if no reasonable jury could find for the claimant based on the undisputed facts).

The standards against which the court must assess the legal sufficiency of the evidence are the substantive evidentiary standards that apply to the underlying claim and related defenses and privileges. As we discuss in the next section, in addition to the elements required to make out a claim for defamation under the law of the District of Columbia, there is a well-developed body of case law, originating with the Supreme Court, that establishes different levels of fault and proof that are designed to protect First Amendment rights. One example is the requirement to

---

(. . . footnote continued)

2014) (concluding that it was not possible to use constitutional avoidance canon to interpret statute to avoid constitutional defect where statutory language "unambiguously require[s] the responding party to produce evidence and the district court to make a finding on whether 'the responding party has produced clear and convincing evidence that the acts of the moving party are not immunized from liability'" (quoting Minn. Stat. § 554.02 (2014)).

prove actual malice by clear and convincing evidence when the claimant is a public official or, as in this case, a limited public figure with respect to the issue that is the subject of speech claimed to be defamatory. *Cf. Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 254-55 (1986) (holding that in evaluating motion for summary judgment under Rule 56, as in evaluating motion for directed verdict under Rule 50 (a), in a case requiring proof of actual malice by clear and convincing evidence, "the judge must view the evidence presented through the prism of the substantive evidentiary burden"). The precise question the court must ask, therefore, is whether a jury properly instructed on the law, including any applicable heightened fault and proof requirements, could reasonably find for the claimant on the evidence presented.[31]

---

[31] Colorado, which was specifically cited in the Committee Report, applies a similar standard. See Report on Bill 18-893 at 2 n.4. In *Protect Our Mountain Env't, Inc. v. Dist. Court*, 677 P.2d 1361 (Colo. 1984), the Colorado Supreme Court crafted a means to protect the First Amendment right to petition of a defendant sued for abuse of process, while also protecting "those truly aggrieved by abuse of these processes to vindicate their own legal rights." *Id*. at 1369. The court permits the parties to present "all material pertinent to the motion" and then considers a motion to dismiss "as one for summary judgment." *Id.* In resolving the motion, the court applies a "heightened standard" intended to protect petitioning activity by requiring a showing that

> (1) the . . . claims were devoid of reasonable factual support, or, if so supportable, lacked any cognizable basis in law for their assertion; and (2) the primary purpose of the defendant's petitioning activity was to harass the plaintiff or to effectuate some other improper objective;

(footnote continued . . . )

We acknowledge that our functional interpretation of the statutory language is not evident from the face of the statute alone. As we have explained, the interpretation we adopt is made possible by the ambiguity of the statutory language and rendered necessary to avoid doubt about the constitutionality of § 16-5502 (b). This interpretation comports with the legislative aim of building special protections for a defendant who makes a prima facie case that the claim arises from advocacy on issues of public interest. A comparison of the procedures usually available in

---

(. . . footnote continued)

> and (3) the defendant's petitioning activity had the capacity to adversely affect a legal interest of the plaintiff.

*Id.*

Other states have adopted similar approaches. California's Anti-SLAPP statute, which requires a showing "that there is a probability that the plaintiff will prevail on the claim," CAL. CIV. PROC. CODE § 425.16 (b)(1) (West 2015), has been interpreted as requiring the plaintiff to "state and substantiate a legally sufficient claim," by "demonstrat[ing]" that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Rusheen v. Cohen*, 128 P.3d 713, 718 (Cal. 2006) (alterations in original omitted) (quoting *Wilson v. Parker, Covert & Chidester*, 50 P.3d 733, 739 (Cal. 2002)). *See also Yount v. Handshoe*, 171 So.3d 381, 387 n.4 (La. Ct. App. 2015) (commenting that Louisiana and California's Anti-SLAPP statutes match "word for word"); *John v. Douglas Cty. Sch. Dist.*, 219 P.3d 1276, 1281 (Nev. 2009)) (stating that under Nevada's statute requiring "clear and convincing evidence [of] a probability of prevailing on the claim," plaintiff must show genuine issue of material fact); OR. REV. STAT. § 31.150 (2010) (providing that if defendant makes prima facie showing speech is protected by statute, "the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case").

civil litigation makes clear that the complement of provisions of the Anti-SLAPP Act impose requirements and burdens on the claimant that significantly advantage the defendant. As we have noted, the filing of a special motion to dismiss stays the claimant's right to seek discovery "until the motion has been disposed of," with a limited exception that favors the defendant. D.C. Code § 16-5502 (c). The Act also places the initial burden on the claimant to present legally sufficient evidence substantiating the merits without placing a corresponding evidentiary demand on the defendant who invokes the Act's protection. *Id.* § 16-5502 (b). This is a reversal of the allocation of burdens for dismissal of a complaint under Superior Court Rule of Civil Procedure 12 (b)(6), which requires the moving party to show that the complaint's allegations, even if proven, would not state a claim as a matter of law; and for summary judgment under Superior Court Rule of Civil Procedure 56, which requires the moving party to wait until discovery has been completed and then shoulder the initial burden of showing that there are no material facts genuinely in dispute and that the movant is entitled to judgment as a matter of law on the undisputed facts.

In addition to these substantive burdens, there are financial levies to deter a SLAPP plaintiff. The Act authorizes the trial court to award costs and fees — including attorney's fees — to a moving party who prevails "in whole or in part"

on a special motion to dismiss. D.C. Code § 16-5504 (a). We have held that under the parallel provision for special motions to quash under D.C. Code § 16-5503, the successful movant is presumptively entitled to an award of fees unless special circumstances make a fee award unjust. *See Burke II*, 133 A.3d at 571. The Act is much less generous to a plaintiff who successfully defends against a special motion to dismiss, allowing the award of costs and fees "only if the court finds that [the] motion . . . is frivolous or is solely intended to cause unnecessary delay." D.C. Code § 16-5504 (b). In sum, the special motion to dismiss not only provides substantial advantages to the defendant over and above those usually available in civil litigation, but also imposes procedural and financial burdens on the plaintiff.

Our interpretation of the requirements and standard applicable to special motions to dismiss ensures that the Anti-SLAPP Act provision is not redundant relative to the rules of civil procedure. A defendant may still file a motion to dismiss a complaint at the onset of litigation under Rule 12, based solely on deficiencies in the pleadings. *See* Super. Ct. Civ. R. 12 (a) (requiring that motion for failure to state a claim must be filed within 20 days of service of complaint). The Anti-SLAPP Act gives the defendant the option to up the ante early in the litigation, by filing a special motion to dismiss that will require the plaintiff to put his evidentiary cards on the table and makes the plaintiff liable for the defendant's

costs and fees if the motion succeeds. D.C. Code § 16-5502 (a) (requiring that special motion to dismiss be filed within forty-five days of service of the complaint); *id.* § 16-5504 (a) (providing for costs and fees). Even if the Anti-SLAPP special motion to dismiss is unsuccessful, the defendant preserves the ability to move for summary judgment under Rule 56 later in the litigation, after discovery has been completed, or for a directed verdict under Rule 50 after the presentation of evidence at trial.[32]

---

[32] The D.C. Circuit has described the Anti-SLAPP Act's "likely to succeed" standard as "an additional hurdle a plaintiff must jump over to get to trial," and opined (without elaboration) that the standard "is different from and more difficult" than for summary judgment under Federal Rule 56. *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333-34 (D.C. Cir. 2015). For the reasons we note in the text, we agree with *Abbas* that the special motion to dismiss is different from summary judgment in that it imposes the burden on plaintiffs and requires the court to consider the legal sufficiency of the evidence presented before discovery is completed. As concerns the standard to be employed by the court in deciding whether to grant the motion, however, the question is substantively the same: whether the evidence suffices to permit a jury to find for the plaintiff.

*Abbas* also stated that the special motion to dismiss created by D.C. Code § 16-5502 does not apply in federal court because it answers the same question as the Federal Rules of Civil Procedure — when a court must dismiss a case before trial — in a different way. *Id*. at 1336. Implicit in *Abbas* is that the special motion to dismiss is only procedural in nature rendering it inapplicable in federal court sitting in diversity. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1104 (D.C. Cir. 2012) (applying *Erie* doctrine to District of Columbia). Other federal appellate courts have come to a different conclusion and applied similar state Anti-SLAPP procedures. *See, e.g.*, *Liberty Synergistics, Inc. v. Microflo Ltd.*, 718 F.3d 138, 143-44 (2d Cir. 2013) (applying California Anti-SLAPP statute's "probability" standard); *Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010) (same); *Godin*, 629 F.3d at 89

(footnote continued . . . )

Finally, our interpretation of the standard applicable to special motions to dismiss as providing an early judicial evaluation of the legal sufficiency of the plaintiff's evidence strikes the right balance between the interests of the parties. Consistent with the Anti-SLAPP Act's purpose to deter meritless claims filed to harass the defendant for exercising First Amendment rights, true SLAPPs can be screened out quickly by requiring the plaintiff to present her evidence for judicial evaluation of its legal sufficiency early in the litigation. But by deferring to the jury's reasonable decision-making, the constitutional right of a plaintiff who has presented evidence that could persuade a jury to find in her favor is respected. It

---

(. . . footnote continued)
(applying Maine Anti-SLAPP statute's special motion to dismiss because it is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right") (quoting *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 423 (2010) (Stevens, J., concurring)); *Henry*, 566 F.3d at 168-69 (applying Louisiana Anti-SLAPP statute's "nominally-procedural" special motion to dismiss "probability" standard). *But cf. Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1361-62 (11th Cir. 2014) (declining to apply Georgia Anti-SLAPP statute's verification requirement because it was procedural and conflicted with Federal Rules of Civil Procedure, which do not require verification).

The applicability of the Anti-SLAPP statute in federal court is not for this court to determine. *Abbas* recognized that at the time, this court "has never interpreted the D.C. Anti-SLAPP Act's likelihood of success standard to simply mirror the standards imposed by" Federal Rule 56. 783 F.3d at 1135. We do so now. This court's interpretation of the standard applicable to the special motion to dismiss under District of Columbia law will no doubt factor into future analysis of the dicta in *Abbas* concerning the applicability of the Anti-SLAPP Act in litigation brought in federal courts. *See Abbas*, 783 F.3d at 1339-1341 (dismissing complaint with prejudice under Rule 12 (b)(6) for failure to state a claim).

bears remembering that the fact that a defendant can make a threshold showing that the claim arises from activities "in furtherance of the right of advocacy on issues of public interest," D.C. Code § 16-5502 (a), does not mean that the defendant is immunized from liability for common law claims. *See Duracraft Corp. v. Holmes Prods. Corp.*, 691 N.E.2d 935, 943 & n.19 (Mass. 1998) (construing Anti-SLAPP statute to avoid unconstitutionality and noting that "[b]y protecting one party's exercise of its right of petition, unless it can be shown to be sham petitioning, the statute impinges on the adverse party's exercise of its right to petition, even when it is not engaged in sham petitioning"). Rather, heightened legal and proof requirements apply when First Amendment rights of the defendant are implicated, but it is possible to meet these requirements by strong evidence in support of the claim. The immunity created by the Anti-SLAPP Act shields only those defendants who face unsupported claims that do not meet established legal standards. Thus, the special motion to dismiss in the Anti-SLAPP Act must be interpreted as a tool calibrated to take due account of the constitutional interests of the defendant who can make a prima facie claim to First Amendment protection *and* of the constitutional interests of the plaintiff who proffers sufficient evidence that the First Amendment protections can be satisfied at trial; it is not a sledgehammer meant to get rid of any claim against a defendant able to make a prima facie case that the claim arises from activity covered by the Act. *See, e.g.*,

*Sandholm v. Kuecker*, 962 N.E.2d 418, 429-30 (Ill. 2012) (noting that Illinois statute is aimed solely at "meritless, retaliatory SLAPPs" and "was not intended to protect those who commit tortious acts and then seek refuge in the immunity conferred by the statute").

To sum up, it is not the court's role, at the preliminary stage of ruling on a special motion to dismiss, to decide the merits of the case but to test the legal sufficiency of the evidence to support the claims. We now turn to a discussion of the operative constitutional and legal substantive and proof requirements that apply to the underlying claims and to an analysis of the legal sufficiency of Dr. Mann's proffered evidence applying those requirements.

## V. Judicial Review for Legal Sufficiency

A court's review for legal sufficiency is a particularly weighty endeavor when First Amendment rights are implicated. The court must "examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964) (quoting *Pennekamp v. Fla.*, 328 U.S. 331, 335 (1946)). The court must consider

whether a properly instructed jury could find for the plaintiff "both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984). This is a question of law, measured against constitutional standards, that does not involve the court in making credibility determinations or weighing the evidence. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685, 690 (1989) (considering findings of fact made by jury along with undisputed evidence in concluding evidence was legally sufficient to prove actual malice); *see id.* at 697-700 (Scalia, J., concurring) (referring to appellate court's "independent assessment of whether malice was clearly and convincingly proved on the assumption that the jury made all the supportive findings it reasonably could have made"). With these principles in mind, we turn to a de novo review of the record to determine whether the evidence produced by Dr. Mann could support, with the clarity required by First Amendment principles, a jury verdict in his favor.

## A. Defamation

To succeed on a claim for defamation, a plaintiff must prove "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement [met the requisite standard];[33] and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (quoting *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1173 n.2 (D.C. 1997)). Appellants contend that the trial court erred in denying their special motions to dismiss because Dr. Mann did not sufficiently substantiate his defamation claim on the first three elements. As to Mr. Lowry's editorial, we agree; but as to some of the other statements on which Dr. Mann bases his complaint, we disagree. We conclude that Dr. Mann hurdled the Anti-SLAPP statute's threshold showing of likelihood of success on the merits because the evidence he has presented is legally sufficient to support findings by the fact-finder that statements in Mr. Simberg's and Mr. Steyn's articles were defamatory, were published by appellants to a third party without privilege, and were made with actual malice.

---

[33] As discussed *infra*, the level of fault — from negligence to actual malice — depends on whether the plaintiff is a public official or, if a private individual, is deemed a public figure with respect to the subject matter of the statement alleged to be defamatory.

## 1. False and Defamatory Statements

A statement is defamatory "if it tends to injure [the] plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (alteration in original) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)). The statement "must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Rosen v. Am. Isr. Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012) (quoting *Howard Univ.*, 484 A.2d at 989).

The important societal interest in vigorous debate over matters of public concern protected by the First Amendment has led to the development of constitutional standards for evaluating statements before liability may be imposed under state defamation laws. Because the First Amendment protects speech as an expression of the fundamental right to freedom of thought, constitutionally speaking, "there is no such thing as a false idea." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)). Expressions of pure opinion, as embodiments of ideas, are generally entitled to constitutional protection. *See id.* (noting that "opinion" and "ideas" are

equated). "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz*, 418 U.S. at 339-40. Therefore, under the First Amendment a statement is not actionable "if it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." *Guilford Transp. Indus.*, 760 A.2d at 597 (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).

Although ideas and opinions are constitutionally protected, the First Amendment does not, however, "create a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich*, 497 U.S. at 18. "[S]tatements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Guilford Transp. Indus.*, 760 A.2d at 597. Whether a defamatory statement of opinion is actionable often depends on the context of the statement in question. *See id.* "If, for example, an average reader would likely understand that particular words, in the context of an entire article, were not meant to imply factual data but, rather, were intended merely to disagree strongly with the views of the [plaintiff], those words would be protected despite their factual content." *Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1211 (D.C. 1991). Thus, statements that constitute "imaginative expression" and

"rhetorical hyperbole" are not actionable because they "cannot reasonably be interpreted as stating actual facts about an individual." *Guilford Transp. Indus.*, 706 A.2d at 596-97 (quoting *Milkovich,* 497 U.S. at 20). Such statements are "used not to implicate underlying acts but 'merely in a "loose, figurative sense"'" to demonstrate strong disagreement" with another's ideas. *Sigal*, 586 A.2d at 1210 (quoting *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1307 (N.Y. 1977)). On the other hand, a statement is actionable if viewed in context it "was capable of bearing a defamatory meaning and . . . contained or implied provably false statements of fact." *Guilford Transp. Indus.*, 760 A.2d at 597.

Appellants contend that all the statements on which Dr. Mann bases his defamation claims are protected under the First Amendment because they expressed appellant's opinions about climate change, a matter of widespread public concern that "must be resolved through the process of free and open debate, not through costly litigation." There is no dispute that the statements that Dr. Mann claims defamed him were made in the context of a broad disagreement between the parties about the existence and cause of global warming, a disagreement that reached a high level of intensity and rhetoric. Public discussion about whether there is a warming climate and, if so, its cause, involves scientific questions and policy prescriptions of general public interest. The First Amendment protects

those engaged in a debate of such public concern in the expression of their ideas on the subject, even with pointed language, free of the chilling effect of potential civil liability. As a matter of constitutional principle, when the issue is whether liability may be imposed for speech expressing scientific or policy views, the question is not who is right; the First Amendment protects the expression of all ideas, good and bad.

But not all the statements cited in the complaint are necessarily cloaked by the First Amendment simply because the articles in which they appeared related to a matter of public concern. As we have discussed, the law distinguishes between statements expressing ideas and false statements of fact. To the extent statements in appellants' articles take issue with the soundness of Dr. Mann's methodology and conclusions — i.e., with ideas in a scientific or political debate — they are protected by the First Amendment. But defamatory statements that are personal attacks on an individual's honesty and integrity and assert or imply as fact that Dr. Mann engaged in professional misconduct and deceit to manufacture the results he desired, if false, do not enjoy constitutional protection and may be actionable. The Second Circuit's observation in *Buckley v. Littell* with respect to defamatory statements about a journalist made in the course of political debate is equally apt to

defamatory statements about a scientist made in the course of scientific and policy debate:

> In short, whatever might be said of a person's political views, any journalist, commentator or analyst is entitled not to be lightly characterized as inaccurate and dishonest or libelous. . . . [I]t is "crucial" to such a person's career that he or she not be so treated. To call a journalist a libeler and to say that he is so in reference to a number of people is defamatory in the constitutional sense, even if said in the overall context of an attack otherwise directed at his political views.

539 F.2d 882, 896-97 (2d Cir. 1976).

Tarnishing the personal integrity and reputation of a scientist important to one side may be a tactic to gain advantage in a no-holds-barred debate over global warming. That the challenged statements were made as part of such debate provides important context and requires careful parsing in light of constitutional standards. But if the statements assert or imply false facts that defame the individual, they do not find shelter under the First Amendment simply because they are embedded in a larger policy debate.

We apply these principles to the statements in the articles cited in the complaint, in the order in which they appeared. The articles, as they appeared on CEI and National Review's websites, are appended to this opinion.

*Mr. Simberg's July 13, 2012 article on CEI's OpenMarket.org.*[34]

Mr. Simberg's article does not specifically criticize Dr. Mann's statistical techniques, except by calling him the "poster boy of the corrupt and disgraced climate science echo chamber."[35] The article's focus is on Dr. Mann personally, alleging that he has engaged in "wrongdoing," "deceptions," "data manipulation," and "academic and scientific misconduct." The article calls Dr. Mann "the Jerry Sandusky of climate science," comparing Dr. Mann's "molest[ing] and tortur[ing] data in the service of politicized science" to Sandusky's "molesting children." The article also describes Dr. Mann as being, "like Joe Paterno," a "rock star" at Penn

---

[34] Rand Simberg, *The Other Scandal in Unhappy Valley*, COMPETITIVE ENTER. INST. (July 13, 2012), https://cei.org/blog/other-scandal-unhappy-valley.

[35] Mr. Simberg's article quotes from a linked article written by Steven McIntyre, which in turn quotes the CRU email that referred to "Mike's Nature trick" and reviews data charts that, according to McIntyre, reveal the "trick." Other links in Mr. Simberg's article are to Mr. Simberg's earlier posts: "The Death of the Hockey Stick?" published online on May 17, 2012, in which Mr. Simberg criticized the methodology and statistical analysis that led to the hockey stick graph by citing the work of other researchers, but without accusing Dr. Mann of personal wrongdoing; and "Climategate: When Scientists Become Politicians," dated November 23, 2009, in which Mr. Simberg commented that climate scientists had subverted proper scientific process by molding data to fit their preconceived ideas about a warming global climate, but without accusing Dr. Mann, personally, of misconduct.

State, who attracted millions of dollars to the University, and, like Bernie Madoff "at the height of his financial career," "a sacred funding cash cow."

A jury could find that the article accuses Dr. Mann of engaging in specific acts of academic and scientific misconduct in the manipulation of data, and thus conveys a defamatory meaning, because "to constitute a libel it is enough that the defamatory utterance imputes any misconduct whatever in the conduct of [plaintiff's] calling." *Guilford Transp. Indus.*, 760 A.2d at 600 (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 569, cmt. (e)); *see Tavoulareas v. Piro*, 817 F.2d 762, 780 (D.C. Cir. 1987) (en banc) (holding that statement that "a father set up his son in business" accuses father of nepotism and is defamatory because it, "might 'tend[] to injure [him] in his trade, profession or community standing, or lower him in the estimation of the community'" (quoting *Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 654 (D.C. Cir. 1966))). Moreover, a jury could find that by calling Dr. Mann "the [Jerry] Sandusky of climate science," the article implied that Dr. Mann's manipulation of data was seriously deviant for a scientist. These noxious comparisons,[36] a jury could find, would demean Dr.

---

[36] These were well-known figures in the public eye. Jerry Sandusky is a notorious convicted child sexual abuser and former assistant football coach at Penn State who was making front-page news at the time. Joe Paterno was the once-revered long-term head football coach at Penn State during the time of Sandusky's

(footnote continued . . . )

Mann's scientific reputation and lower his standing in the community by making him appear similarly "odious, infamous, or ridiculous." *Rosen*, 41 A.3d at 1256; *see also Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) (*Jankovic I*) (holding that statement was capable of defamatory meaning because it suggested Serbian businessman was an ally of the Milosevic regime for which, as in the case of the apartheid regime in South Africa, Americans have an "intense antipathy" (quoting *South. Air Transp., Inc., v. ABC, Inc.*, 877 F.2d 1010, 1015 (D.C. Cir. 1989))).

Appellants contend that Mr. Simberg's article is more reasonably understood as a criticism of the hockey stick graph and the research that underlies it. This seems to be a forced interpretation — and one that a jury could easily reject — because the article does not comment on the specifics of Dr. Mann's methodology at all. Nor does the article purport to reveal previously unknown facts about Dr. Mann's methodology, which was apparent from his published work and numerous articles commenting on the hockey stick graph and its findings. In a different context, the article's use of the phrase "corrupt and disgraced climate science," could, as appellants argue, be interpreted as criticism of flawed scientific

---

(. . . footnote continued)

depredations.  Bernie Madoff is a convicted criminal who swindled billions of dollars from thousands of investors and charities through a massive Ponzi scheme.

methodology. But when the phrase is used in conjunction with assertions that Dr. Mann engaged in "deception[]," "misconduct," and "data manipulation," and the article concludes that he should be further investigated, the cumulative import is that there are sinister, hidden misdeeds he has committed. These are pointed accusations of personal wrongdoing by Dr. Mann, not simply critiques of methodology of his well-known published scientific research. *Cf. Milkovich*, 497 U.S. at 21 ("This is not the sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining that the petitioner committed the crime of perjury."). We conclude that Mr. Simberg's article is capable of conveying a defamatory meaning.

Appellants do not argue that Mr. Simberg's article, if capable of conveying a defamatory meaning, is not actionable because the statements that Dr. Mann engaged in deception and misconduct are true. Their argument is that the statements are not verifiably false because they are simply Mr. Simberg's opinion. *See Oparaugo*, 884 A.2d at 76 (noting that defamation requires that statement be both defamatory and false). To be clear, the Supreme Court has rejected "an additional separate constitutional protection for 'opinion'" as such, deeming that the dual constitutional requirements of falsity and fault, as well as a searching appellate judicial review, suffice "to ensure the freedom of expression guaranteed

by the First Amendment." *Milkovich*, 497 U.S. at 20-21. The reason a pure statement of opinion is not actionable is that, not being factual, it cannot be proved to be false. *See id*. at 20. It is also clear, however, that "the First Amendment gives no protection to an assertion 'sufficiently factual to be susceptible of being proved true or false' *even if* the assertion is expressed by implication in 'a statement of opinion.'" *Jankovic v. Int'l Crisis Grp.* (*Jankovic II*), 593 F.3d 22, 27 (D.C. Cir. 2010) (quoting *Milkovich*, 497 U.S. at 20, 21). We, therefore, turn to a close reading of Mr. Simberg's article to determine whether it asserts or implies a defamatory provable *fact*. *See Moldea v. N.Y. Times Co.* (*Moldea I*), 15 F.3d 1137, 1144 (D.C. Cir. 1994) (noting this is "a question of law for the court to determine as a threshold matter").

Mr. Simberg's article contains two principal defamatory assertions about Dr. Mann. The first is that Dr. Mann has been "shown" to have behaved in a "deceptive" and "most unscientific manner" because he "molested and tortured data in the service of politicized science" as was "revealed" in the leaked CRU emails. This is followed by a related defamatory assertion, that Dr. Mann engaged in "academic and scientific misconduct" that Penn State's investigation

exonerating Dr. Mann of these charges failed to uncover because Penn State was biased and its investigation was a "whitewash."[37]

We note that in the article Mr. Simberg does not employ language normally used to convey an opinion, such as "in my view," or "in my opinion," or "I think."[38] The article's assertions about Dr. Mann's deception and misconduct are stated objectively, as having been "shown" and "revealed" by the CRU emails. Thus, Mr. Simberg's article can fairly be read as making defamatory factual assertions outright. Mr. Simberg would not have concluded the article with the

---

[37] The full concluding paragraphs in Mr. Simberg's article state:

> Michael Mann, like Joe Paterno, was a rock star in the context of Penn State University, bringing millions in research funding. The same university president who resigned in the wake of the Sandusky scandal was also the president when Mann was being ~~whitewashed~~ investigated. We saw what the university administration was willing to do to cover up heinous crimes, and even let them continue, rather than expose them. Should we suppose, in light of what we now know, they would do any less to hide academic and scientific misconduct, with so much at stake?

> It's time for a fresh, truly independent investigation.

[38] This is not to suggest that use of such words would automatically insulate the ensuing statements from liability. "In my opinion, Jones is a liar" is actionable if the statement is false and the speaker acted with the requisite degree of fault. *See Milkovich*, 497 U.S. at 18-19, 20. But the absence of such language is one indication of how the article would come across to the reader.

prescription that a "fresh, truly independent investigation" is necessary, unless he supposed that "ordinary, reasonable readers could read the [article] as implying," *Jankovic II*, 593 F.3d at 25, that Dr. Mann was guilty of misconduct that had to be ferreted out. An opinion may be subject to further discussion or debate, but a "truly independent *investigation*" is necessary to uncover facts that, impliedly, are there to be found. Moreover, Mr. Simberg cites the CRU emails as proof of Dr. Mann's deception and academic and scientific misconduct. The assertion that the CRU emails showed or revealed that Dr. Mann engaged in deception and academic and scientific misconduct is not simply a matter of opinion: not only is it capable of being proved true or false, but the evidence of record is that it actually has been proved to be false by four separate investigations.

Appellants attempt to find shelter in post-*Milkovich* appellate decisions recognizing that "a statement of opinion that is based upon *true* facts that are revealed to readers . . . [is] generally . . . not actionable so long as the opinion does not otherwise imply unstated defamatory facts." *Moldea I*, 15 F.3d at 1144. The theory is that when a writer discloses the facts upon which a statement is based, the reader will understand that the statement reflects the writer's view, based on an interpretation of the facts disclosed, such that the reader remains "free to draw his or her own conclusion based upon those facts." *Id.* at 1145. This argument is

unavailing here. First, as we have discussed, a jury could reasonably interpret Mr. Simberg's article as asserting as *fact* that the CRU emails "show[]" that Dr. Mann engaged in deceptive data manipulation and academic and scientific misconduct. In this regard, this case is markedly different from *Rosen*, where we noted that because no specific misconduct was mentioned in the allegedly defamatory statement, "no one hearing the general characterizations . . . could have discerned particular behaviors that were concrete enough to reveal 'objectively verifiable' falsehoods," and that the statements "exuded merely subjective evaluation — essentially a 'statement of opinion' without an 'explicit or implicit factual foundation.'" 41 A.3d at 1259 (footnote omitted).

Second, to claim this form of protection from liability, the facts on which the purported opinion is based must be accurate and complete. *See Milkovich*, 497 U.S. at 18-19 ("[E]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect, or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.").[39]

_____

[39] In *Jankovic II* the court summarily dismissed the publisher's argument that the defamatory statement was protected as opinion because it was offered as the writer's interpretation of a fact that was disclosed in the report, noting that this protection applies only where opinion is "based on true facts, accurately disclosed." 593 F.3d at 28. Because an inaccurate fact (that one of the plaintiff's companies was on a frozen assets list because it provided support to the Milosevic

(footnote continued . . . )

Mr. Simberg's article does not assemble facts that prove Dr. Mann's alleged deception and misconduct, but primarily criticizes two entities, Penn State and the National Science Foundation, that investigated those charges and concluded they are unfounded. The target of the article is Dr. Mann; the criticism of these two investigations is a means to that end. Mr. Simberg's attack on the investigations begins with a mocking reference to Dr. Mann's "exoneration" by Penn State. It points to the University's vested financial interest in Dr. Mann and what Mr. Simberg characterizes as the University's resulting "whitewash" in its investigation of the accusations leveled against Dr. Mann, comparing it to Penn State's previous investigation in the Sandusky case.[40] The article also refers to the report of the National Science Foundation,[41] and acknowledges that the NSF

---

(. . . footnote continued)

regime) was cited as the basis of the report's purported opinion that the plaintiff supported the regime in exchange for favorable treatment of his businesses, the defamatory statement was not protected as opinion. *Id*.

[40] The Penn State report on the investigation of Dr. Mann is embedded as a link in Mr. Simberg's article, as is the Freeh Report, which criticized inadequacies in Penn State's investigation of Sandusky (not Dr. Mann).

[41] The article does not include a link to the NSF Report itself but to a secondary source that describes its substantive observations and conclusions. Mr. Simberg's article inaccurately refers to the report as having been produced by "NAS" instead of "NSF." The National Academy of Sciences, a private nonprofit organization, is a different entity than the National Science Foundation, an independent government funding agency. *See* National Academy of Sciences,

(footnote continued . . . )

investigation confirmed Penn State's conclusion that Dr. Mann had not engaged in misconduct. Mr. Simberg questions the independent corroboration of the NSF report, however, because, as he emphasizes, "more importantly," the NSF "relied on the integrity of [Penn State] to provide them with all relevant material." In other words, the NSF investigation and report should not be trusted because they were tainted by reliance on Penn State's biased and inadequate work.

In this, Mr. Simberg's article was inaccurate. As the NSF Report clearly lays out, in addition to "fully review[ing] all the reports and documentation the University provided," NSF reviewed "a substantial amount of publicly available documentation concerning both [Dr. Mann's] research and parallel research conducted by his collaborators and other scientists in that particular field of research." The NSF also independently interviewed Dr. Mann, his "critics, and disciplinary experts."[42] Moreover, the article was incomplete because it failed to mention two other parallel investigations of the CRU emails, conducted in the

---

(. . . footnote continued)
http://www.nasonline.org/ (last visited Oct. 5, 2016); National Science Foundation, https://www.nsf.gov/ (last visited Oct. 5, 2016).

[42] Appellants CEI and Mr. Simberg impliedly concede that the description of the NSF investigation in the article is inaccurate, acknowledging in their reply brief that the NSF interviewed Dr. Mann's critics. But, as noted in the text and in the NSF report itself, that is not all that NSF did in conducting its own separate investigation, after reviewing the Penn State report.

United Kingdom, that came to the same conclusion as Penn State and NSF. In short, Mr. Simberg's assertions that the CRU emails revealed deception and academic and scientific misconduct on the part of Dr. Mann that Penn State covered up and NSF failed to uncover, are not protected as opinion based on accurate, complete facts, because the article gave a skewed and incomplete picture of the facts a reader would need to come to his or her own conclusions on the matter. *See Moldea I*, 15 F.3d at 1144.

Even allowing for the use of hyperbole in the public discussion about global warming, we conclude that the statements in Mr. Simberg's article that Dr. Mann acted dishonestly, engaged in misconduct, and compared him to notorious persons, are capable of conveying a defamatory meaning with the requisite constitutional certainty and included statements of fact that can be proven to be true or false.

*Mr. Steyn's July 15, 2012 article on* National Review*'s "The Corner"*[43]

National Review argues that Mr. Steyn's statement that "Michael Mann was the man behind the fraudulent climate-change 'hockey stick' graph" could be, and

---

[43] Mark Steyn, *Football and Hockey*, NATIONAL REVIEW (July 15, 2012), http://www.nationalreview.com/corner/309442/football-and-hockey-mark-steyn.

therefore should be, interpreted as expressing vigorous disagreement with the idea represented by the hockey stick graph and as criticism of the methodology that Dr. Mann used in gathering the data that led to the graph. As such, National Review contends that the statement is not actionable because it does not possess the clarity of defamatory meaning required by the Constitution. *See Greenbelt Coop. Publ'g Ass'n v. Bressler*, 398 U.S. 6, 13-14 (1970) (noting that the word "blackmail," when used to describe a real estate developer's negotiating position, was not defamatory as "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole" to express that the developer was being unreasonable where the description of the negotiations was "accurate and full"). At oral argument, counsel for National Review explained that "fraudulent" was intended to mean (or could reasonably be interpreted as meaning) that Dr. Mann's research is not reliable because he "cherry-picked" the data on which he relied and compared "apples to oranges" in producing the hockey stick graph, by first relying on temperature data derived from proxy sources (such as tree rings) and, after a certain date, using actual measured temperatures. We agree that if the use of "fraudulent" in this one sentence were the only arguably defamatory statement in Mr. Steyn's article, we would have to conclude that it is insufficient as a matter of law, as such an ambiguous statement may not be presumed to necessarily convey a

defamatory meaning. In such a case, the First Amendment tips the judicial balance in favor of speech. *See Bose*, 466 U.S. at 505.

Statements are not to be viewed in isolation but in context, however. *See Guilford Transp. Indus.*, 760 A.2d at 597. Mr. Steyn's article continued the theme of personal attack and innuendo against Dr. Mann commenced in Mr. Simberg's article. It begins by quoting three sentences from Mr. Simberg's article that refer to "hockey-stick deceptions" by "molest[ing] and tortur[ing] data," and the comparison of Dr. Mann to Sandusky. Mr. Steyn first appears to retreat from the comparison to Sandusky, saying that he is "[n]ot sure" that he would have extended the metaphor "all the way into the locker-room showers," but then adds that Mr. Simberg "has a point." *See Olinger v. Am. Savs. & Loan Ass'n*, 409 F.2d 142, 144 (D.C. Cir. 1969) ("The law affords no protection to those who couch their libel in the form of . . . repetition . . . repetition of a defamatory statement is a publication in itself.") (citation omitted). Referring to the investigation of Dr. Mann by a "deeply corrupt [Penn State University] administration," Mr. Steyn elaborates that "as with Sandusky and Paterno" Penn State University "declined to find one of its star names guilty of any wrongdoing." The clincher in Mr. Steyn's article: "If an institution is prepared to cover up systemic statutory rape of minors,

what won't it cover up?" The implication that serious misconduct has been covered up is inescapable.

Appellants would have us conclude that the comparisons of Dr. Mann to notorious individuals are merely exaggerated — if crass — depictions of a policy opponent. There is an important distinction, however, between generic labels with derogatory connotations and comparisons to specific individuals from which defamatory factual allegations can be inferred. Thus, in *Buckley*, the Second Circuit dismissed defamation claims that were based on statements in a book that described William F. Buckley, Jr.,[44] as "fascist," "fellow traveler," and "radical right," because even if the labels were insulting and derogatory, they could not be proven to be false statements of fact due to "the tremendous imprecision of the meaning and usage of these terms in the realm of political debate." 539 F.2d at 893. The same book also described Buckley as having lied about and libeled several people who could take him to court "if they wanted to and could afford it," and compared Buckley to another journalist, identified by name, "who lied day after day in his column." *Id*. at 895. These statements, the court held, were actionable because they "make a factual assertion relating to Buckley's journalistic

---

[44] Mr. Buckley was a well-known and influential conservative author and commentator, and the founder of *National Review*. *Buckley*, 539 F.2d at 885-86.

integrity." *Id*. at 895-96. The comparison to a known liar, the court noted, "as it appears on its face states that Buckley was engaging in libelous journalism" and, as it was proven to be false, was "constitutionally as well as tortiously defamatory." *Id*. at 896.

The statements in Mr. Steyn's article are similarly factual and specific in their attack on Dr. Mann's scientific integrity. As with Mr. Simberg's article, Mr. Steyn's is not about the merits of the science of global warming, but about Dr. Mann's "deceptions" and "wrongdoing." Like Mr. Simberg, Mr. Steyn compares Dr. Mann's alleged wrongdoing — "molesting" and "torturing" data to achieve a deceptive but desired result that will court funding for Penn State — to that of Sandusky, which suggests that their characters are similarly base. ("Whether or not he's 'the Jerry Sandusky of climate change,' he remains the Michael Mann of climate change.") The accusation is bolstered by referring to the University's investigation as a "cover-up" of Dr. Mann's "wrongdoing" in order to protect someone who was a "star name" at Penn State like Sandusky and Paterno. Because the allegations impugned Dr. Mann's scientific integrity and likened him to notorious individuals connected to Penn State in whom the University had (according to Mr. Steyn) a similar financial interest to protect, the statements are not merely fanciful or extreme, purely for rhetorical effect. As in *Buckley*, they

deliver an indictment of reprehensible conduct against Dr. Mann that a reader could take to be an assertion of a true fact.[45] These injurious allegations about Dr. Mann's character and his conduct as a scientist are capable of being verified or discredited. If they are proven to be false, the statements breach the zone of protected speech. *See Buckley*, 539 F.2d at 895-96.

*Mr. Lowry's August 22, 2012 editorial for* National Review[46]

We come to a different conclusion with respect to the third in the series of articles that Dr. Mann claims defamed him, Mr. Lowry's editorial for *National Review*. In the editorial, Mr. Lowry is responding to Dr. Mann's threatened

---

[45] We reject appellants' argument that "the correct measure of the challenged statements' verifiability as a matter of law is whether *no reasonable person* could find that the [] characterizations were supportable interpretations" of the work being criticized. *Moldea v. N.Y. Times Co*., 22 F.3d 310, 317 (D.C. Cir. 1994) (*Moldea II*) (modifying *Moldea I*). As *Moldea II* made clear, however, that stricter standard depends on the genre of the work, and "takes into account the fact that the challenged statements appeared in the context of a book review, and were solely evaluations of a literary work." *Id*. In the case of an "ordinary libel," the standard is "whether a reasonable jury *could find* that the challenged statements were false." *Id*. (contrasting "reviewer's comments on a literary work" with a "review that stated or implied that [the work] was a badly written book because its author was a drug dealer"). As appellants' articles were not reviews of artistic work, but "garden-variety" libels, *id*. at 315, about the character of Dr. Mann, we apply the "supportable interpretation" standard, *id*. at 316.

[46] Rich Lowry, *Get Lost*, NATIONAL REVIEW (August 22, 2012), http://www.national review.com/blogs/314680.

lawsuit after *National Review* rejected the request for an apology and retraction. The editorial refers and links to Mr. Steyn's article, characterizing it as "mild" and "f[a]ll[ing] considerably short of" Mr. Simberg's article; Mr. Lowry does not repeat Mr. Steyn's statements except to say that Mr. Steyn referred to the hockey stick graph as "fraudulent." The editorial does not disavow Mr. Steyn's use of the word "fraudulent" but puts a gloss on it, explaining that "[i]n common polemical usage, 'fraudulent' doesn't mean honest-to-goodness criminal fraud. It means intellectually bogus and wrong." In sum, Mr. Lowry's editorial does not repeat or endorse the factual assertions that Dr. Mann engaged in deception and misconduct that we have found to be actionable in Mr. Simberg's and Mr. Steyn's articles.

Mr. Lowry's editorial ridicules Dr. Mann, repeatedly calling him "poor Michael," describing his letter as "laughably threatening" and "pathetically lame chest-thumping," and saying that if he proceeds with a lawsuit Dr. Mann "risks making an ass of himself." The editorial mocks the threatened lawsuit and even welcomes it, as a way of "teach[ing] [Dr. Mann] a thing or two about how the law and how free debate works in a free country." These statements, however belittling of Dr. Mann, are not statements of fact, but of Mr. Lowry's opinion of Dr. Mann and his threatened lawsuit. Even though the ultimate success or failure of Dr. Mann's lawsuit will eventually be a provable fact, it was not so at the time

the editorial was written — it still is not so — and Mr. Lowry's opinions on the matter are protected speech. Mr. Lowry's editorial is clearly an attempt to distance Mr. Steyn's article that appeared on *National Review*'s website from Mr. Simberg's that appeared on CEI's, and to express to *National Review*'s readers that it is confident of the success of the vigorous defense that it intended to mount in response to Dr. Mann's threatened lawsuit. Because Mr. Lowry's editorial for *National Review* does not repeat or endorse the actionable defamatory statements in Mr. Simberg's and Mr. Steyn's articles or contain defamatory assertions of fact that were provably false at the time they were made, the editorial is an expression of opinion protected by the First Amendment.[47]

We emphasize that in conducting a review of the legal sufficiency of the evidence "it is the role of the court to determine whether the challenged statement[s] [are] 'capable of bearing a particular meaning' and whether 'that

---

[47] As the allegedly defamatory statements were included in the complaint and Mr. Lowry's editorial was appended to the complaint, the claims based on these statements could have been dismissed, for failure to state a claim, under Superior Court Civil Rule 12 (b)(6). *Clawson v. St. Louis Post-Dispatch, LLC*, 906 A.2d 308, 312-13 (D.C. 2006) (noting that newspaper article appended to complaint could be considered in ruling on Rule 12 (b)(6) motion, which presented issue of law whether use of word "informer' was capable of conveying defamatory meaning). The additional evidence presented by Dr. Mann in opposition to the special motion to dismiss was unnecessary to test the legal sufficiency of the statements; its relevance went primarily to the issue of actual malice, discussed *infra*.

meaning is defamatory.'" *Tavoulareas*, 817 F.2d at 779 (quoting RESTATEMENT (SECOND) OF TORTS § 614 (1)). "The jury's proper function, in turn, is to determine whether a statement, held by the court to be capable of a defamatory meaning, was in fact attributed such a meaning by its readers." *Id*. at 780. As we conclude that Dr. Mann has demonstrated that Mr. Simberg's and Mr. Steyn's articles are capable of conveying a defamatory meaning and contain statements of fact that can be proven to be true or false, we continue to evaluate the legal sufficiency of the evidence with respect to the other elements of defamation.

## 2. Publication

"[A] cause of action for defamation requires proof of publication of the defamatory statement to a third party." *Oparaugo*, 884 A.2d at 73. Dr. Mann presented documentation showing that Mr. Simberg's article appeared on the website of CEI and Mr. Steyn's on the website of *National Review*. Notably, CEI and Mr. Simberg do not dispute that Mr. Simberg's blog post on CEI's website constituted publication.[48]

---

[48] As we have concluded that the defamation claims based on Mr. Lowry's editorial are not actionable, we do not address CEI's argument (presented for the first time on appeal) that hyperlinking Mr. Lowry's editorial on the CEI website does not suffice to satisfy the element of publication.

National Review takes a different position.  It argues that it cannot be held liable for any of the statements made by Mr. Simberg or Mr. Steyn that appeared on its website.  According to National Review, it is shielded from liability by the Communications Decency Act of 1996 ("CDA"), because its website is a "provider . . . of an interactive computer service"[49] that may not be "treated as the publisher or speaker of any information provided by another information content provider."[50]  47 U.S.C. § 230 (c)(1).  Under the CDA "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with" § 230 (c)(1).  47 U.S.C. § 230 (e)(3).  This argument was not raised in the trial court and is not properly before us.  *See Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 304 n.11 (D.C. 2006) ("Generally, issues not raised in the trial court will not be considered on appeal.").  Moreover, it is not a pure question of law that we may decide on appeal without an adequate trial court record.  As National Review notes in its brief, the availability of § 230

---

[49]  The CDA defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."  47 U.S.C. § 230 (f)(2).

[50]  The CDA defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230 (f)(3).

immunity under the CDA involves a three-part test that inquires into the nature of the website and the involvement of the website provider with the content of the statement, including the relationship with its author. *See Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (stating that § 230 mandates dismissal of action if defendant is a "provider or user of an interactive computer service," statement on which liability is based is "provided by another content provider," and liability is based on publishing or speaking the statement); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162-63 (9th Cir. 2008) (noting that "[a] website operator can be both a service provider and a content provider" under the CDA:  immune as a "service provider" if it "passively displays content that is created entirely by third parties," but a "content provider" and thus not immune if it displays content that "it creates itself, or is 'responsible, in whole or in part for' creating").  These are questions that have not been developed or considered in the trial court, and that Dr. Mann has not had an opportunity to address.

On the record before us, Dr. Mann met his burden of demonstrating that a jury could find that Mr. Simberg's and Mr. Steyn's articles were published to a third party.

### 3. Actual Malice

An essential safeguard of First Amendment rights is the "breathing space" for uninhibited expression, *NAACP v. Button*, 371 U.S. 415, 433 (1963), afforded by the heightened showing of fault — actual malice — that must be proved in defamation cases that rely on statements made about public figures concerning matters of public concern,[51] *see N.Y. Times Co.*, 376 U.S. at 279-80 (imposing heightened standard to defamation action brought by a state official); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967) (plurality opinion), 164 (Warren, C.J., concurring), 170 (Black, J., concurring in part and dissenting in part), 172-73 (Brennan, J., concurring in part and dissenting in part) (extending the actual malice standard to public figures). Moreover, to prevail, the plaintiff in such a lawsuit bears a higher burden of proof than the preponderance of the evidence standard usually applicable in civil cases; the plaintiff must persuade the fact-finder that the defendant acted with actual malice in publishing the defamatory statements by clear and convincing evidence. *See N.Y. Times Co.*, 376 U.S. at 285-86 (referring to the "convincing clarity which the constitutional standard demands").

---

[51] The parties agree, as do we, that Dr. Mann is a limited public figure with respect to statements about global warming because he has assumed a role in "the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345.

A plaintiff may prove actual malice by showing that the defendant either (1) had "subjective knowledge of the statement's falsity," or (2) acted with "reckless disregard for whether or not the statement was false." *Burke I*, 91 A.3d at 1044. The "subjective" measure of the actual malice test requires the plaintiff to prove that the defendant actually knew that the statement was false. *See N.Y. Times Co.*, 376 U.S. at 280. The "reckless disregard" measure requires a showing higher than mere negligence; the plaintiff must prove that "the defendant in fact entertained serious doubts as to the truth of [the] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."). The plaintiff may show that the defendant had such serious doubts about the truth of the statement inferentially, by proof that the defendant had a "high degree of awareness of [the statement's] probable falsity." *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 688 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). A showing of reckless disregard is not automatically defeated by the defendant's testimony that he believed the statements were true when published; the fact-finder must consider assertions of good faith in view of all the circumstances. *St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."). Thus, in considering the evidentiary sufficiency of the plaintiff's

response to a special motion to dismiss filed under D.C. Code § 16-5502 (b), the question for the court is whether the evidence suffices to permit a reasonable jury to find actual malice with convincing clarity.[52]

There is a hefty volume of evidence in the record. Appellants' special motions to dismiss were accompanied by various investigatory reports cited in Dr. Mann's complaint and several articles by third parties that criticize the investigations underlying the reports. In his response, Dr. Mann also submitted extensive documentation from eight separate inquiries that either found no evidence supporting allegations that he engaged in fraud or misconduct or concluded that the methodology used to generate the data that resulted in the

---

[52] In this case, the trial court characterized the evidence of actual malice as "slight" and as not amounting to a showing by clear and convincing evidence, but stated that it was "sufficient to find that further discovery may uncover evidence of 'actual malice.'" We are not constrained by the trial court's conclusion in this regard, as the sufficiency of the evidence to support a finding of actual malice is a question of law that we review de novo. *See Harte-Hanks Commc'ns*, *Inc.*, 491 U.S. at 685. We note, however, that if the trial court considers that the evidence presented in opposition to a special motion to dismiss is not sufficient to go to a jury, the court must grant the motion to dismiss as the opponent has the burden to demonstrate a sufficient evidentiary basis for his claim. *See* D.C. Code § 16-5502 (b). The court is not at liberty to dispense with this statutory burden. The Anti-SLAPP Act authorizes the court to permit targeted discovery for the purpose of responding to a special motion to dismiss. Granting a request for such discovery was the proper way to proceed, if it "appear[ed] likely that targeted discovery [would] enable the plaintiff" to shoulder his evidentiary burden to overcome the special motion to dismiss *and* would not be "unduly burdensome" to the defendants. *Id*. § 16-5502 (c)(2).

hockey stick graph is valid and that the data were not fabricated or wrongly manipulated.

Not all the evidence before the court was relevant to the question of whether appellants acted with the requisite malice in accusing Dr. Mann of engaging in deceptive behavior and misconduct. We set aside the reports and articles that deal with the validity of the hockey stick graph representation of global warming and its underlying scientific methodology. The University of East Anglia, the U.S. Environmental Protection Agency, and the U.S. Department of Commerce issued reports that concluded that the CRU emails did not compromise the validity of the science underlying the hockey stick graph. As we have explained, the expression of scientific and policy opinions in the debate over global warming that the hockey stick illustrates is speech protected by the First Amendment. Much as Dr. Mann's pride in his work may be wounded by criticisms of the hockey stick graph, appellants are entitled to their opinions on the subject and to express them without risk of incurring liability for defamation. The proper place for the discussion is the scientific community and the public sphere of policy prescriptions.

The reports that are relevant to the defamation claims are those that concern appellants' statements that Dr. Mann engaged in "dishonesty," "fraud," and

"misconduct." The University of East Anglia Independent Climate Change E-mails Review, Penn State University, the United Kingdom House of Commons, and the Office of the Inspector General of the U.S. National Science Foundation, all conducted investigations and issued reports that concluded that the scientists' correspondence in the 1,075 CRU emails that were reviewed did not reveal research or scientific misconduct. Appellants do not counter any of these reports with other investigations into the CRU emails that reach a contrary conclusion about Dr. Mann's integrity.

The issue for the court at this juncture is to determine whether the conclusions reached by these various investigations, when considered in view of all the evidence before the court, permit a jury to find, by clear and convincing evidence, that appellants either knew their accusations of misconduct were false or made those accusations with reckless disregard for their truth.

We begin our examination by noting that the results of the investigations that Dr. Mann says exonerate him of wrongdoing were made public; appellants do not claim they were unaware of them when they made the challenged statements. In assessing whether these reports provided appellants with "obvious reasons to doubt the veracity," *St. Amant*, 390 U.S at 732, of their subsequent statements that

Dr. Mann engaged in misconduct, we consider (as would a jury) the source of the reports, the thoroughness of the investigations, and the conclusions reached. As the reports are extensive, we summarize the relevant portions in this opinion.

We are struck by the number, extent, and specificity of the investigations, and by the composition of the investigatory bodies. We believe that a jury would conclude that they may not be dismissed out of hand. Although we do not comment on the weight to be given to the various investigations and reports, which is a question for the jury, what is evident from our review is that they were conducted by credentialed academics and professionals.[53] The investigations

---

[53] The first Penn State investigation, into allegations of research misconduct, was directed Henry C. Foley, Ph.D, Vice President for Research and Dean of the Graduate School; Alan W. Scaroni, Ph.D., Associate Dean for Graduate Education and Research, College of Earth and Mineral Sciences; and Ms. Candice A. Yekel, M.S., CIM, Director of the Office for Research Protections and Research Integrity Officer. A second Penn State investigation, into compliance with accepted academic practices, was conducted by Sarah M. Assmann, Waller Professor, Department of Biology; Welford Castleman, Evan Pugh Professor and Eberly Distinguished Chair in Science, Department of Chemistry and Department of Physics; Mary Jane Irwin, Evan Pugh Professor, Department of Computer Science and Electrical Engineering; Nina G. Jablonski, Department Head and Professor, Department of Anthropology; Fred W. Vondracek, Professor, Department of Human Development and Family Studies; with Candice Yekel, Director of the Office for Research Protections. The National Science Foundation's investigation was conducted by its Office of Inspector General. The University of East Anglia's Independent Climate Change E-mails Review was led by Sir Muir Russell, a former professor and Vice Chancellor for the University of Glasgow, and current chair of the Judicial Appointments Board for Scotland. He

(footnote continued . . . )

considered, and expressly rejected, the claim that the CRU emails substantiated charges of misconduct, fraud, and deception. The investigations posed their questions in slightly different ways and conducted their analyses in accordance with their own procedures and standards, a mark of the cumulative strength of the conclusion each reached unanimously and without equivocation: that the CRU emails did not support the conclusion that the scientists engaged in fabricating or deceptively manipulating data, or in scientific misconduct, fraud or dishonesty in their reporting and presentation of research results.

The Penn State investigation report looked into "research misconduct" such as "manipulating data, destroying records and colluding to hamper the progress of scientific discourse"[54] the National Science Foundation considered "allegations of

(. . . footnote continued)

was assisted by Professor Geoffrey Boulton, Regius Professor Emeritus of Geology and former Vice Principal of the University of Edinburgh; Professor Peter Clarke, Professor of Physics at the University of Edinburgh; Mr. David Eyton, Head of Research & Technology at British Petroleum; and Professor James Norton, an independent policy advisor from the U.K. Parliament's Office of Science & Technology. The United Kingdom's investigation was conducted by the House of Commons' Science and Technology Committee, comprised of fourteen members of the House of Commons from the Labour Party, the Conservative Party, the Liberal Democrats Party, and an independent.

[54] Penn State conducted two separate investigations by two different investigatory bodies. The first was into research misconduct; after the first investigation found no research misconduct, the second took a broader view and

(footnote continued . . . )

research misconduct" the University of East Anglia investigated "whether data had been manipulated or suppressed" the U.K. House of Commons considered whether the scientists had "deliberately misrepresented the data." These reports expressly disclaimed that their purpose or conclusions were concerned with the validity of the underlying statistical methodology, or its representation in the hockey stick graph.[55]

_____

(. . . footnote continued)

considered whether Dr. Mann had "engaged in, or participated in, directly or indirectly, any actions that seriously deviated from accepted practices within the academic community for proposing, conducting, or reporting research or other scholarly activities."

[55] For example, the report commissioned by the University of East Anglia states: "The Review examines the honesty, rigour and openness with which the CRU scientists have acted. It is important to note that we offer no opinion on the validity of their scientific work. Such an outcome could only come through the normal processes of scientific debate and not from the examination of e-mails or from a series of interviews about conduct."

From the Penn State report: "[R]esearch misconduct does not include disputes regarding honest error or honest differences in interpretations or judgments of data, and is not intended to resolve bona fide scientific disagreement or debate." "We are aware that some may seek to use the debate over Dr. Mann's research conduct and that of his colleagues as a proxy for the larger and more substantive debate over the science of anthropogenic global warming and its societal (political and economic) ramifications. We have kept the two debates separate by only considering Dr. Mann's conduct."

From the report of the U.K. House of Commons, Science and Technology Committee: "The complaints and accusations made against CRU in relation to the scientific process come under two broad headings. The first is transparency . . . . The second is honesty: that CRU has deliberately misrepresented the data, in order

(footnote continued . . . )

Appellants offer several reasons why the reports do not supply sufficient evidence for the jury to find that they acted with actual malice.

1. *Appellants' Honest Belief*

Appellants contend that because the challenged statements reflect their subjective and honest belief in the truth of their statements, actual malice cannot be proven. This argument, however, presupposes what the jury will find on the facts of this case. The issue for the court is whether, taking into account the substantive conclusions of investigatory bodies constituted to look into the very evidence — the CRU emails — that appellants' statements claimed as factual proof of Dr. Mann's deception and misconduct, a jury could find, by clear and convincing evidence, that appellants acted with "actual malice." This is a determination the

---

(. . . footnote continued)

to produce results that fit its preconceived views about the anthropogenic warming of the climate." "If there had been more time available before the end of this Parliament we would have preferred to carry out a wider inquiry into the science of global warming itself."

From the report of the National Science Foundation, Office of Inspector General: "Although [Dr. Mann's] data is still available and still the focus of significant critical examination, no direct evidence has been presented that indicates the Subject fabricated the raw data he used for his research or falsified his results. . . . Such scientific debate is ongoing but does not, in itself, constitute evidence of research misconduct."

jury could reach by finding either that appellants knew their defamatory statements were false, or that appellants acted with reckless disregard for the truth of their statements. It is for the jury to determine the credibility of appellants' protestations of honest belief in the truth of their statements, and to decide whether such a belief, assuming it was held, was maintained in reckless disregard of its probable falsity.[56]

2. *Unreliability of Reports*

As Mr. Simberg and Mr. Steyn make clear in their articles, they dismiss the Penn State investigation as biased, conducted by insiders with a vested interest in upholding Dr. Mann's reputation as a leading climate scientist. The articles describe the Penn State investigation as a "cover-up" and a "whitewash," and argue they have a good basis for believing so in light of Penn State's shoddy investigation of Jerry Sandusky, in which he was cleared in the face of multiple allegations of sexually abusing children for which he was subsequently charged

---

[56] Appellants have made representations in their briefs about their subjective belief, but there is no evidence in the record (beyond the articles that are the subject of the defamation action) in the form of affidavits or depositions attesting to the personal beliefs of Mr. Simberg, Mr. Steyn, or the responsible personnel at CEI and National Review, and how they came to have such beliefs in light of the reports that had been issued before the statements were made.

and convicted. Even if appellants' skepticism of the Penn State report were to be credited by a jury as a valid reason for not taking its conclusions seriously, that leaves three other reports, from separate investigatory bodies in academia and government, on both sides of the Atlantic, that also found no wrongdoing.[57]

Appellants argue that the investigatory reports could not be relied upon by a jury because the investigations Dr. Mann claims exonerate him of misconduct "take no ultimate position," but only indicate that there was "no evidence" of fraud. This is a quibble about wording that does not call into question the import

---

[57] Of particular relevance to appellants' criticism of the Penn State investigation is the report of the National Science Foundation, an independent federal agency that funded Dr. Mann's scientific research, and therefore had a responsibility to monitor and ensure compliance with required standards. As the NSF report states, it examined "de novo" each of three allegations of misconduct leveled against Dr. Mann that were dismissed by the Penn State report. As part of that review, NSF "reviewed the emails and concluded that nothing contained in them evidenced research misconduct." The NSF found that Penn State had adequately addressed those three allegations. However, the NSF found the Penn State investigation deficient concerning the allegation concerning data fabrication or falsification because the University had not interviewed experts critical of Dr. Mann's research. The NSF Office of Inspector General then undertook its own independent investigation of this allegation, broadened it beyond data falsification, and interviewed Dr. Mann, his critics, and disciplinary experts. After concluding its independent investigation, the NSF found "no evidence" that data had been fabricated or falsified or that Dr. Mann had engaged in any other types of research misconduct. The NSF closed its investigation "with no further action." Thus, even if appellants initially had reason to be skeptical of Penn State's motivations and thoroughness, a jury could find that the independent, de novo investigation by the NSF corroborated the Penn State findings, as did the investigations conducted by the University of East Anglia and the U.K. House of Commons.

of the investigations' conclusions. An investigatory body can report only on what it has found; a determination that there is "no evidence" of fraud is an ultimate conclusion that investigation has not turned up any evidence of misconduct.

Appellants also contend that the investigatory reports cannot be relied upon to find that they purposely avoided the truth because the investigations do not, in fact, "exonerate" Dr. Mann. They point to the report of the University of East Anglia, which states that the hockey stick graph that was submitted for inclusion in the 1999 WMO Report and IPCC Third Assessment Report was "misleading." The UEA report does use the word "misleading." As that report makes clear, however, what it meant is not that the statistical procedures used to generate the hockey stick graph — which involved reconstructions of temperature through the use of proxies (such as tree rings) or splicing data from different sources — are themselves misleading, but that an explanation of those procedures should have been included in the graph itself or in immediately accompanying text. It is not an indictment of the deceptive use of data, but a comment on how the graph could and should have been presented to be more transparent to the readers of the WMO and IPCC Reports. With respect to the allegations of misconduct it investigated, the report of the University of East Anglia is unequivocal in its conclusion:

> Climate science is a matter of such global importance, that the highest standards of honesty, rigour and openness are needed in its conduct. On the specific allegations made against the behaviour of CRU scientists, we find that their rigour and honesty as scientists are not in doubt.[58]

Appellants argue that the investigations of the University of East Anglia and the U.K. House of Commons also cannot be said to have exonerated Dr. Mann because they were primarily focused on the conduct of the scientists in the U.K., at the University of East Anglia's Climate Research Unit. The CRU emails at the core of those investigations, however, contained exchanges between these scientists, specifically, the CRU's head, Philip Jones, and Dr. Mann or referred to Dr. Mann. See *supra* note 9. The National Science Foundation Report was specifically focused on Dr. Mann and similarly concluded that there was "no specific evidence that [Dr. Mann] falsified or fabricated any data and no evidence that his actions amounted to research misconduct." The Penn State investigations also were specifically directed at Dr. Mann's conduct.

---

[58] The report did criticize the CRU scientists for their "unhelpfulness" in responding to FOIA requests and for deleting emails that may be requested.

3. *Subjectivity of Reports*

Appellants contend that the investigations' conclusions need not have alerted them to the probable falsity of their beliefs because the reports reflected no more than subjective and standardless opinions on the manner in which Dr. Mann and the other scientists conducted their work. A jury could well think otherwise. Each of the reports cites to specific standards for assessing the allegations of misconduct. The Penn State investigation refers to the University's Research Administration Policy No. 10; the National Science Foundation Office of Inspector General conducted a de novo review of the CRU emails and relevant documents against NSF Research Misconduct Regulation, 45 C.F.R. § 689.1 (plagiarism, fabrication, falsification), and other requirements applicable to federal awardees under federal statutes, such as the False Claims Act, 18 U.S.C. § 287, and False Statements Act, 18 U.S.C. § 1001; and the U.K. House of Commons investigation specifically inquired into charges of "dishonesty" and falsification of data for the purpose of exaggerating global warming arising out of the scientists' use of the phrases "trick" and "hide the decline" in the most-quoted CRU email referring to Dr. Mann's statistical technique; the University of East Anglia's investigation set out its analytic parameters for assessing the "honesty, rigour and openness" of the CRU scientists' handling of data as follows:

> In making its analysis and conclusions, the Team [of investigators] will test the relevant work against pertinent standards at the time it was done, recognizing that such standards will have changed. It will also test them against current best practice, particularly statements of the ethics and norms such as those produced by the UK Government Office for Science and by the US National Academy of Sciences. These identify principles relating to rigour, respect and responsibility in scientific ethics and to integrity, accessibility and stewardship in relation to research data.

The fact that the standards applied to charges of scientific and research misconduct are primarily professional or ethical, not criminal, and that their application requires the exercise of judgment does not mean that they lack substantive content, real-life consequences, or make them incapable of verification.[59] These standards do not suffer from the defect we identified in *Rosen*, that "no threshold showing of falsity is possible" where there were no standards of "a particular kind identifiable in writing," and thus the challenged statement was "too subjective, too amorphous, [and] too susceptible of multiple interpretations." 44 A.3d at 1255, 1260 (noting statement's reference to

---

[59] *See Jankovic II*, 593 F.3d at 28 (noting that a proposition is "verifiable in the practical sense that our legal system is ready to make decisions on the basis of how such issues are resolved — decisions profoundly affecting people's lives"). As an example, the conduct of lawyers is evaluated against professional and ethical standards, and civil liability and disciplinary sanctions can be imposed based on findings that those standards have been violated.

unspecified "standards [the employer] expected of its employees").

As the preceding discussion demonstrates, appellants' objections to the reports can fairly be characterized as arguments that could be made to a jury as to why the reports' conclusions should not be credited or given much weight. We do not judge whether appellants' arguments will persuade a jury. Our task now is not to anticipate whether the jury will decide in favor of appellants or Dr. Mann, but to assess whether, on the evidence of record in connection with the special motion to dismiss, a jury *could* find for Dr. Mann.

We reviewed a comparable constellation of facts in *Nader v. de Toledano*, the first case considered by this court following the Supreme Court's adoption of the actual malice standard for defamation actions by public figures. 408 A.2d 31 (D.C. 1979). The case involved Ralph Nader, the well-known consumer advocate, who sued a journalist who wrote a newspaper column criticizing Nader, saying that it had been "demonstrate[d] conclusively that Nader falsified and distorted evidence" during hearings before a Senate subcommittee. *Id.* at 37-38. In support of this assertion, the column referred to a Senate Report, issued after an extensive investigation, that rejected the thrust of Nader's testimony as unsubstantiated. *Id.* at 37. The Report also stated, however, that the testimony had been presented "in

good faith based on the information available" to Nader at the time. *Id.* On appeal of the trial court's grant of summary judgment to the journalist, the court reversed and remanded the case for trial. The court dismissed the argument that a finding of malice would be impermissible because the journalist asserted that he "honestly believed in the truth of his statement when he published it," concluding that the Report's "explicit, unambiguous finding" that Nader had acted in good faith afforded "a sufficient evidentiary basis from which a reasonable inference" could be drawn that the statement that Nader "falsified and distorted evidence" had been made with actual malice. *Id.* at 53.

We come to the same conclusion as in *Nader*. In the case before us now, not one but four separate investigations were undertaken by different bodies following accusations, based on the CRU emails, that Dr. Mann had engaged in deceptive practices and scientific and academic misconduct. Each investigation unanimously concluded that there was no misconduct. Reports of those investigations were published and were known to appellants prior to Mr. Simberg's and Mr. Steyn's articles continuing to accuse Dr. Mann of misconduct based on the emails that were the subject of the investigations. Applying the reasoning in *Nader* to the

evidence now of record in this case, we conclude that a jury could find that appellants' defamatory statements were made with actual malice.[60]

There is, in this case, another factor that a jury could take into account in evaluating appellants' state of mind in publishing the statements accusing Dr. Mann of misconduct and deception. As the articles that form the basis of Dr. Mann's complaint make clear, appellants and Mr. Steyn are deeply invested in one side of the global warming debate that is opposed to the view supported by Dr. Mann's research. Although animus against Dr. Mann and his research is by itself insufficient to support a finding of actual malice where First Amendment rights are implicated, bias providing a motive to defame by making a false statement may be a relevant consideration in evaluating other evidence to determine whether a statement was made with reckless disregard for its truth. *See Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 664-65, 667-68, 689 n.36 (stating that "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry," and noting that jury could have found actual malice on the basis, *inter alia*, that publisher was biased against plaintiff and in a "bitter rivalry" with

---

[60] Our legal conclusion is based on the evidence that has been presented at this juncture, in connection with the special motion to dismiss. Once discovery is completed, the legal conclusion that the evidence is sufficient to go to trial could change.

another newspaper that would be impugned by discrediting the plaintiff); *see also Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011) (distinguishing between common law malice, for which "ill will" or bad faith is sufficient, and "actual malice" required by the First Amendment). In evaluating the evidence in this case, for example, the jury could consider that appellants' zeal in advancing their cause against the hockey stick graph's depiction of a warming global climate led them to accuse Dr. Mann, one of its most prominent proponents, of deception and misconduct in producing the graph with reckless disregard of their knowledge that several investigations had discredited those accusations. *See Tavoulareas*, 817 F.2d at 796 (noting that evidence of ill will or bad motive, if probative of a "willingness to publish *unsupported* allegations," may be suggestive of actual malice).

Just as this court's decision in *Nader* provides a useful comparison with the facts of this case, the D.C. Circuit's recent opinion in *Jankovic v. Int'l Crisis Grp.* (*Jankovic III*), 822 F.3d 576 (D.C. Cir. 2016), provides a useful contrast. After deciding in two previous appeals, during the twelve-year course of litigation, that a report stating that a Serbian businessman had supported the Milosevic regime in exchange for favorable treatment for his businesses was capable of conveying a defamatory meaning, see *supra* at 60, and that the statement was actionable

because it was not purely an opinion but asserted a false fact as justification, see *supra* note 39, the court addressed the element of actual malice. The court evaluated the evidence to determine whether it would allow a jury to find, by clear and convincing evidence, that the International Crisis Group's (ICG) publication of the statement was made with actual malice. Concluding that the evidence was insufficient as a matter of law, the court noted the following facts: ICG considered that the writer of the report was an able analyst and expert on the Balkans; the writer had conducted research of published reports and Serbian press accounts, and had interviewed a number of confidential sources in government, business, and NATO embassies, before writing the report; and the report was reviewed and edited by the writer's supervisor, the head of research, and ultimately approved by ICG's president. *Id*. at 591-92.

The court stressed that because the plaintiff had not produced evidence that the writer had reason to doubt his research and sources, his failure to investigate further or question his sources did not show actual malice or a reckless disregard for the truth. "[I]t is only when a plaintiff offers evidence that 'a defendant has reason to doubt the veracity of its source' does its 'utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story' demonstrate reckless disregard." *Id*. at 590 (quoting *McFarlane v. Sheridan*

*Square Press, Inc.*, 91 F.3d 1501, 1510 (D.C. Cir. 1996)). "Absent such evidence . . . [the writer's] extensive background research and reporting on the Balkans, his understanding of the Serbian press, and his good faith belief that the frozen assets list implied more than it actually did, belies actual malice." *Id*. at 597. In sum, the court concluded, what was missing was evidence that the publisher had "serious doubt" or had "a high degree of awareness" of the statement's probable falsity, and thereby "acted with reckless disregard" for the truth of the defamatory statement. *Id*.

What was present in *Jankovic III* that lent support to the claim of good faith belief is missing here. Unlike in *Jankovic III*, where the court noted that ICG had relied on an able analyst who had researched, reviewed and edited the report prior to publication, in this case there is, at this point, no similar evidence that Mr. Simberg, Mr. Steyn, CEI, or National Review conducted research or investigation that provided support for their defamatory statements that Dr. Mann engaged in deception and misconduct. The only support cited in the articles are the CRU emails, with primary reliance on the language in one email that referred to "Mike's *Nature* trick." But what the court noted was missing in *Jankovic III* to support a finding of actual malice is present here: evidence that there was reason to doubt the emails as a reliable source for the belief that Dr. Mann had engaged in

misconduct. That evidence has been presented in the form of reports from four separate investigations that debunked the notion that the emails and, specifically the reference to Dr. Mann's "trick," revealed deception in the presentation of data and scientific misconduct.

On the current record, where the notion that the emails support that Dr. Mann has engaged in misconduct has been so definitively discredited, a reasonable jury could, if it so chooses, doubt the veracity of appellants' claimed honest belief in that very notion. A jury could find, by clear and convincing evidence, that appellants "in fact entertained serious doubts" or had a "high degree of awareness" that the accusations that Dr. Mann engaged in scientific misconduct, fraud, and deception, were false, and, as a result, acted "with reckless disregard" for the statements' truth when they were published. *Nader*, 408 A.2d at 41, 50-53.

## B. Intentional Infliction of Emotional Distress

The complaint's claim for intentional infliction of emotional distress was based on the statement that compared Dr. Mann to Jerry Sandusky.[61] To establish

---

[61] "Dr. Mann could be said to be the Jerry Sandusky of climate science, except for instead of molesting children, he has molested and tortured data in the

(footnote continued . . . )

a prima facie case of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Williams v. District of Columbia*, 9 A.3d 484, 493-94 (D.C. 2010) (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003)). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 494 (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)). As a constitutional matter, a public figure "may not recover for the tort of intentional infliction of emotional distress by reason of publication[] . . . without showing in addition that the publication contains a false statement of fact which was made with 'actual malice.'" *Hustler Magazine, Inc.*, 485 U.S. at 56.

Our conclusion that the evidence presented suffices to permit a jury to find the constitutional requirement of actual malice also satisfies the mens rea element of the tort of intentional infliction of emotional distress. Arguably, appellants' statement comparing Dr. Mann to a convicted child sexual abuser could be

---

(. . . footnote continued)
service of politicized science that could have dire consequences for the nation and planet."

considered to be not simply a serious departure from journalistic standards, but also "outrageous" and "extreme in degree," particularly where there was no legitimate need or urgency that might excuse it. *Cf. Minch v. District of Columbia*, 952 A.2d 929, 941 (D.C. 2008) (noting the pressure on police officers who publicly and prematurely identified a student as suspect in one murder as they confronted murder of a second student at undergraduate campus). We need not decide whether the statement permits a finding that appellants' conduct was "extreme and outrageous," because we conclude that Dr. Mann has not demonstrated that he is likely to succeed in proving that he suffered the severe emotional distress required to prevail on a claim for intentional infliction of emotional distress.

The complaint alleges that as a result of the defamatory statements "besmirching Dr. Mann's reputation and comparing him to a convicted child molester," Dr. Mann has suffered "extreme emotional distress," "mental anguish," and "personal humiliation." From the statement itself, a jury could infer that the comparison to Sandusky was particularly hurtful. Dr. Mann's requests for an apology and retraction, and his undertaking this litigation, would allow a jury to infer that he was so deeply aggrieved that he deemed it necessary to restore his public reputation. Dr. Mann has presented no evidence, however, that his

understandable consternation met the high bar of "severe emotional distress," which requires a showing beyond mere "mental anguish and stress" and must be "of so acute a nature that harmful physical consequences are likely to result." *Armstrong v. Thompson*, 80 A.3d 177, 189-90 (D.C. 2013) (quoting *Futrell*, 816 A.2d at 808); *see also Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 81 (D.C. 2011) (en banc) (noting that claim of negligent infliction of emotional distress requires showing of emotional distress that is "acute, enduring or life-altering"). We, therefore, conclude that, on the record before us, the evidence is insufficient to support a finding that Dr. Mann suffered "severe" emotional distress. *See id.* at 182, 189 (noting that plaintiff's "strong distress" resulting from false statements to prospective employer that plaintiff was under investigation "for suspected violations of both a criminal and administrative nature" that led to rescission of employment offer was insufficient to show "severe emotional distress"). As Dr. Mann has not produced or proffered evidence that he is likely to succeed in proving that he suffered severe emotional distress, appellants' special motions to dismiss the claim of intentional infliction of emotional distress should have been granted.

**\*\*\***

Concluding that we have jurisdiction pursuant to the collateral order doctrine to hear appellants' interlocutory appeal of the trial court's denial of their special

motions to dismiss under the District's Anti-SLAPP Act, we hold that the Act's "likely to succeed on the merits" standard for overcoming a special motion to dismiss filed under D.C. Code § 16-5502 (b) requires that the plaintiff present an evidentiary basis that would permit a reasonable, properly instructed jury to find in the plaintiff's favor. Dr. Mann has supplied sufficient evidence for a reasonable jury to find, by a preponderance of the evidence, that statements in the articles written by Mr. Simberg and Mr. Steyn were false, defamatory, and published by appellants to third parties, and, by clear and convincing evidence, that appellants did so with actual malice. We, therefore, affirm the trial court's denial of the special motions to dismiss the defamation claims based on those articles and remand the case for additional proceedings in the trial court with respect to these claims. *Id*. We reverse the trial court's denial of the special motions to dismiss with respect to Dr. Mann's defamation claims based on Mr. Lowry's editorial and the claim for intentional infliction of emotional distress. On remand, the court shall dismiss these claims with prejudice. *Id*. § 16-5502 (d).

*So ordered.*

# APPENDIX

**The Other Scandal In Unhappy Valley**[62]

by Rand Simberg on July 13, 2012

in Global Warming, Transparency

So it turns out that Penn State has covered up wrongdoing by one of its employees to avoid bad publicity.

But I'm not talking about the appalling behavior uncovered this week by the Freeh report. No, I'm referring to another cover up and whitewash that occurred there two years ago, before we learned how rotten and corrupt the culture at the university was. But now that we know how bad it was, perhaps it's time that we revisit the Michael Mann affair, particularly given how much we've also learned about his and others' hockey-stick deceptions since. Mann could be said to be the Jerry Sandusky of climate science, except for instead of molesting children, he has molested and tortured data in the service of politicized science that could have dire economic consequences for the nation and planet.

To review, when the emails and computer models were leaked from the Climate Research Unit at the University of East Anglia two and a half years ago, many of the luminaries of the "climate science" community were shown to have been behaving in a most unscientific manner. Among them were Michael Mann, Professor of Meteorology at Penn State, whom the emails revealed had been engaging in data manipulation to keep the blade on his famous hockey-stick graph, which had become an icon for those determined to reduce human carbon emissions by any means necessary.

As a result, in November of 2009, the university issued a press release that it was going to undertake its own investigation, independently of one that had been launched by the National Academy of Sciences (NAS) in response to a demand from Congressman Sherwood Boehlert (R- N.Y.). In July of the next year, the panel set up to investigate declared him innocent of any wrongdoing:

---

[62] The underlining in the articles in the Appendix indicate a hyperlink.

Penn State Professor Michael Mann has been cleared of any wrongdoing, according to a report of the investigation that was released today (July 1). Mann was under investigation for allegations of research impropriety that surfaced last year after thousands of stolen e-mails were published online. The e-mails were obtained from computer servers at the Climatic Research Unit of the University of East Anglia in England, one of the main repositories of information about climate change.

The panel of leading scholars from various research fields, **all tenured professors at Penn State**, began its work on March 4 to look at whether Mann had "engaged in, directly or indirectly, any actions that seriously deviated from accepted practices within the academic community for proposing, conducting or reporting research or other scholarly activities."

My emphasis.

Despite the fact that it was completely internal to Penn State, and they didn't bother to interview anyone except Mann himself, and seemingly ignored the contents of the emails, the warm mongers declared him exonerated (and the biggest victim in the history of the world). But many in the skeptic community called it a whitewash:

This is not surprising that Mann's own university circled the wagons and narrowed the focus of its own investigation to declare him ethical.

The fact that the investigation cited Mann's 'level of success in proposing research and obtaining funding' as some sort of proof that he was meeting the 'highest standards', tells you that Mann is considered a sacred funding cash cow. At the height of his financial career, similar sentiments could have been said about Bernie Madoff.

Mann has become the posterboy of the corrupt and disgraced climate science echo chamber. No university whitewash investigation will change that simple reality.

Richard Lindzen of MIT weighed in as well:

"Penn State has clearly demonstrated that it is incapable of monitoring violations of scientific standards of behavior internally," Lindzen said in an

e-mail from France.

But their criticism was ignored, particularly after the release of the NAS report, which <u>was also purported to exonerate him</u>. But in rereading the NAS "exoneration," some words stand out now. First, he was criticized for his statistical techniques (which was the basis of the criticism that resulted in his unscientific behavior). But more importantly:

> The OIG also independently reviewed Mann's emails and PSU's inquiry into whether or not Mann deleted emails as requested by Phil Jones in the "Climategate" emails (aka Allegation 2). The OIG concluded after reviewing the published CRU emails and **the additional information provided by PSU** that "nothing in [the emails] evidenced research misconduct within the definition of the NSF Research Misconduct Regulation." Furthermore, the OIG accepted the conclusions of the PSU inquiry regarding whether Mann deleted emails and agreed with PSU's conclusion that Mann had not.

Again, my emphasis. In other words, the NAS investigation relied on the integrity of the university to provide them with all relevant material, and was thus not truly independent. We now know in hindsight that it could not do so. Beyond that, there are still relevant emails that we haven't seen, two years later, because the University of Virginia continues to stonewall on a FOIA request, and it's <u>heading to the Supreme Court of the Commonwealth of Virginia</u>.

Michael Mann, like Joe Paterno, was a rock star in the context of Penn State University, bringing in millions in research funding. The same university president who resigned in the wake of the Sandusky scandal was also the president when Mann was being whitewashed ~~investigated~~. We saw what the university administration was willing to do to cover up heinous crimes, and even let them continue, rather than expose them. Should we suppose, in light of what we now know, they would do any less to hide academic and scientific misconduct, with so much at stake?

It's time for a fresh, truly independent investigation.

# NATIONAL REVIEW

**Football and Hockey**

By Mark Steyn — July 15, 2012

In the wake of Louis Freeh's report on Penn State's complicity in serial rape, Rand Simberg writes of Unhappy Valley's other scandal:

> I'm referring to another cover up and whitewash that occurred there two years ago, before we learned how rotten and corrupt the culture at the university was. But now that we know how bad it was, perhaps it's time that we revisit the Michael Mann affair, particularly given how much we've also learned about his and others' hockey-stick deceptions since. Mann could be said to be the Jerry Sandusky of climate science, except that instead of molesting children, he has molested and tortured data in the service of politicized science that could have dire economic consequences for the nation and planet.

Not sure I'd have extended that metaphor all the way into the locker-room showers with quite the zeal Mr Simberg does, but he has a point. Michael Mann was the man behind the fraudulent climate-change "hockey-stick" graph, the very ringmaster of the tree-ring circus. And, when the East Anglia emails came out, Penn State felt obliged to "investigate" Professor Mann. Graham Spanier, the Penn State president forced to resign over Sandusky, was the same cove who investigated Mann. And, as with Sandusky and Paterno, the college declined to find one of its star names guilty of any wrongdoing.

If an institution is prepared to cover up systemic statutory rape of minors, what won't it cover up? Whether or not he's "the Jerry Sandusky of climate change", he remains the Michael Mann of climate change, in part because his "investigation" by a deeply corrupt administration was a joke.

# NATIONAL REVIEW

**Get Lost**

My response to Michael Mann.

By Rich Lowry — August 22, 2012

**S**o, as you might have heard, Michael Mann of Climategate infamy is threatening to sue us.

Mann is upset — very, very upset — with <u>this </u>Mark Steyn Corner post, which had the temerity to call Mann's hockey stick "fraudulent." The Steyn post was mild compared with other things that have been said about the notorious hockey stick, and, in fact, it fell considerably short of an item about Mann published elsewhere that Steyn quoted in his post.

So why threaten to sue us? I rather suspect it is because the Steyn post was savagely witty and stung poor Michael.

Possessing not an ounce of Steyn's wit or eloquence, poor Michael didn't try to engage him in a debate. He sent <u>a laughably threatening letter</u> and proceeded to write pathetically lame chest-thumping posts on his Facebook page. (Is it too much to ask that world-renowned climate scientists spend less time on Facebook?)

All of this is transparent nonsense, as <u>our letter of response</u> outlines.

In common polemical usage, "fraudulent" doesn't mean honest-to-goodness criminal fraud. It means intellectually bogus and wrong. I consider Mann's prospective lawsuit fraudulent. Uh-oh. I guess he now has another reason to sue us.

Usually, you don't welcome a nuisance lawsuit, because it's a nuisance. It consumes time. It costs money. But this is a different matter in light of one word: discovery.

If Mann sues us, the materials we will need to mount a full defense will be extremely wide-ranging. So if he files a complaint, we will be doing more than fighting a nuisance lawsuit; we will be embarking on a journalistic project of great interest to us and our readers.

And this is where you come in. If Mann goes through with it, we're probably going to call on you to help fund our legal fight and our investigation of Mann through discovery. If it gets that far, we may eventually even want to hire a dedicated reporter to comb through the materials and regularly post stories on Mann.

My advice to poor Michael is to go away and bother someone else. If he doesn't have the good sense to do that, we look forward to teaching him a thing or two about the law and about how free debate works in a free country.

He's going to go to great trouble and expense to embark on a losing cause that will expose more of his methods and maneuverings to the world. In short, he risks making an ass of himself. But that hasn't stopped him before.


*— Rich Lowry is the editor of* NATIONAL REVIEW.